Edgardo **GIERBOLINI COLON**, Plaintiff,

v.

Awilda **APONTE ROQUE**, individually and as Secretary of the Department of Education of the Commonwealth of Puerto Rico, Agustin Mercado Rosa, individually and as General Administrator of Radio and Television Services of the Department of Public Education, Defendants.

Civ. No. 85–1237 (JP).

United States District Court,
D. Puerto Rico.

June 11, 1987.

Urgell, Miranda & Feijoo, San Juan, P.R., for plaintiff.

José A. Andreu García, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

PIERAS, District Judge.

This is an action for injunctive relief and damages brought under 42 U.S.C. section 1983, in which plaintiff alleged violation of his constitutional rights to freedom of belief and association and due process under the law. This Court has jurisdiction over the subject matter of the complaint under 28 U.S.C. sections 1331 and 1343(3).

A non-jury trial was held where both parties presented their witnesses and submitted documentary evidence. Based on the evidence submitted by the parties and after due deliberation, this Court now makes the following Findings of Fact and Conclusions of Law. Fed.R.Civ.P. Rule 52.

## FINDINGS OF FACT

1. WIPR–AM & FM are owned and operated by the Department of Education of the Commonwealth of Puerto Rico. The FM station broadcasts at a frequency of 91.3 megahertz. Its programming combines public affairs, news, popular music, and fine arts programming. The AM station broadcasts at a frequency of 940 kilohertz and provides largely similar programming.

2. Plaintiff Edgardo Gierbolini has been employed with the Department of Education since June 17, 1970. He was first employed as a scriptwriter of Radio Programs and progressed through the ranks of the Department to the position of Director of the Radio Station. Gierbolini is a career employee. At the time of his demotion from the directorship of the radio station, he was a career employee under applicable Puerto Rico Civil Service law.

3. Plaintiff was appointed Interim Director of the Radio Station in January 1980, and on September 1984, was appointed Director of the Radio Station on a probationary status, with an increase in monthly salary from $840.00 to $1,381.00.

4. Plaintiff's probationary period ended on April 30, 1985.

5. Plaintiff received two evaluations during his probationary period. The first of these was performed on December 18, 1984, by the then acting General Manager of the Radio and Television Service of the Department of Education, Dr. Sigfredo Quiñones. This evaluation graded plaintiff's job performance as exceeding required levels of proficiency in all categories. The second evaluation was performed by defendant Agustín Mercado Rosa in his capacity as General Manager of the Radio and Television Service. This evaluation covered the period of February 1, 1985, to April 30, 1985. In contrast to the previous evaluation, the second was completely negative.

6. Based on Mercado's evaluation, plaintiff was separated from his position of Director of the Radio Station by letter signed by defendant and Secretary of the Department of Education, Awilda Aponte Roque on May 22, 1985. By that same letter, Gierbolini was reinstated to his former position as Scriptwriter of Radio Programs II. Plaintiff's monthly salary was reduced correspondingly from $1,381.00 to $1,165.00.

7. The Popular Democratic Party (PDP) won the general elections held in Puerto Rico on November 1984. The New Progressive Party (NPP) lost control of the executive, which it had held for the previous eight years.

8. Aponte Roque and Mercado are members of the PDP and were appointed to their respective positions of Secretary of Education and General Administrator after the elections of 1984, when Rafael Hernández Colón, the PDP's standard bearer, assumed the governorship.

9. Plaintiff is, and was at the time that he was demoted, a member of the NPP. Gierbolini's affiliation was known to defendants Aponte Roque and Mercado at the time of plaintiff's demotion from his directorship.

10. Mercado and Aponte Roque did not meet with plaintiff before or after the negative evaluation of defendant Mercado to discuss the way in which the Radio Station was operating or to inform him of the changes they wanted in the station's management.

11. The testimony of Gierbolini's previous supervisors, Dr. Elsie Calero and Dr. Sigfredo Fontanez, established that, as Interim Director and Director of the Radio Station, Gierbolini efficiently fulfilled his duties in all of the areas for which he was evaluated, including those areas in which Mercado negatively evaluated him on April 30, 1985.

12. One of the reasons given by Mercado for his low evaluation of plaintiff was that Gierbolini permitted a spiritualist ses-

sion at the Radio Station during working hours, had done nothing to stop it, and did not disciplined the participants. However, the following was established through plaintiff's testimony as well as through the testimony of both defendants: (1) Gierbolini rendered a report to Mercado on the incident, including the names of the persons involved, with copy to the grievance committee of the Department of Education; (2) defendant Aponte Roque received a copy of said report; (3) it was not in Gierbolini's power to take disciplinary action against the participants in the spiritualist session; and (4) neither defendants, nor anybody else in the Department of Education, took, or had taken to the date of the trial, any type of disciplinary action against any of the participants in the spiritualist session.

13. The grievance committee submitted a report to defendants on the spiritualist session where it found that said session was part of a "special" which was to be aired through the station. With such a finding, the authorities did not deem the activity improper.

14. Another of the reasons given by Mercado for his evaluation of plaintiff Gierbolini was the latter's alleged involvement with the disappearance of certain public address equipment. However, when the equipment arrived to the Radio Station in 1977, plaintiff was only a Scriptwriter II and neither received nor had any responsibility for the equipment. Gierbolini nevertheless submitted a report to Mercado on the matter at Mercado's request. Mercado's request came after Gierbolini had been removed as Director of the Radio Station. The memorandum requesting this report was the only communication of any of the defendants with plaintiff on the matter of the missing equipment.

15. Mercado testified that another of the reasons why he did not think that Gierbolini was doing a proper job was that he did not keep adequate working hours. However, in his formal evaluation of plaintiff, Mercado evaluated Gierbolini as fulfilling his duties as to attendance, which, according to the evaluation form, includes promptness and punctuality.

16. Mercado also testified to some alleged problems with personnel management which were attributable to plaintiff. These allegations remained unsubstantiated by the testimony at trial.

17. The Court finds Mercado's claims of Gierbolini's lack of leadership, managerial abilities, and otherwise incompetence for the job to be not credible. Based on the testimony of witnesses Dr. Elsie Calero and Dr. Sigfredo Fontanez, the Court is of the opinion that Gierbolini was performing perfectly adequate job as Director of the Radio Station. Furthermore, defendants never instructed plaintiff, either in writing or personally, as to any objections to Gierbolini's management of the Radio Station, despite Mercado's stated preference for documentation of all operational aspects of the Radio and Television service.

18. Defendant's sole purpose in concocting the negative evaluation was to remove Gierbolini as Director of the Radio Station because, as a member of the NPP, Gierbolini did not share defendants' political affiliation.

19. Credible testimony showed that Gierbolini objected in writing to Mercado's negative evaluation and that Aponte Roque knew of this letter prior to removing Gierbolini as Director of the Radio Station. She did not however respond to Gierbolini regarding these objections nor did she ever meet with Gierbolini to discuss them.

20. Plaintiff Gierbolini was never given a hearing prior to his removal as Director of the Radio Station.

21. Because of his removal as Director of the Radio Station, Gierbolini suffered a reduction in salary, great humiliation and considerable mental pain and anguish.

## CONCLUSIONS OF LAW

Section 1983 of Title 42 of the United States Code, provides in part

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subject, or causes

to be subjected, any citizen of the United States or other person within the jurisdiction thereof to deprivation of any rights, priviledges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Plaintiff alleged violation of two rights: the right to be free from deprivation of property without due process of law under the fourteenth amendment, and the right to freedom of association and belief under the first amendment.

### A. Fourteenth Amendment Claim

Plaintiff averred that he was deprived of his property, i.e., his position as Director of the Radio Station, without due process of law. This claim depends on whether Gierbolini had a property right to continue in that position. *Board of Regents v. Roth,* 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972). Only once the property right is established would the question arise of what process, if any, was due. Almost hornbook law by now, for the purposes of procedural due process claims in public employment cases, "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....'" *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). The state law in this matter is the civil service code contained in Title 3 of the Laws of Puerto Rico Annotated, section 1301 *et seq.* When Gierbolini was demoted on May 22, 1985, the reason given was the performance evaluation for February 1, to April 30, 1985. That latter date marked the end of Gierbolini's probationary period as Director. At that time he was returned to his lower ranking career position as scriptwriter. Had the evaluation read favorably, the civil service code would have transformed Gierbolini to a regular career employee. 3 L.P.R.A. § 1333(10) (1978). For all intents and purposes, Gierbolini was a probationary employee until the last evaluation on that probation was finished and a decision on whether he satisfactorily completed the period was made. As a career employee, Gierbolini's property right would be established by those sections of the code that authorizes removal only for good cause, after preferment of charges in writing. 3 L.P.R.A. § 1336(4), (8) (Supp.1985). As a probationary employee, however, Gierbolini could be "severed from office during the probationary period when it is considered that his services, habits or attitudes do not warrant to grant him the status of regular [i.e., career] employee." 3 L.P.R.A. § 1336(7) (1978). The justification that defendants gave was that Gierbolini's services were inadequate in the directorship.

The Court has specifically found that defendants' allegations of Gierbolini's incompetence were a sham. These were merely trumped up charges used to dispose of a politically undesireable Director. The Court does not consider that the second evaluation in any way indicates how Gierbolini functioned as Director and seriously doubts the evaluation contains even a modicum of truth in any of its unfavorable reports. As such, that evaluation must be disregarded utterly.

Having disposed of defendants' transparent reasons for removing Gierbolini as Director, we are taken back to section 1333(10): "Upon satisfactory completion of the probationary period the employee shall become a regular career employee." With no justification for removal save Gierbolini's NPP affiliation, it must be said that Gierbolini did in fact satisfactorily completed his probationary period and therefore passed into the career realm as Director of the Radio Station.

Gierbolini's property interest in this position was such that he was entitled to retain this position, and could be removed only for "good cause, after preferment of charges in writing," or for conviction of a "felony or any offense implying moral turpitude, or for infraction of his official duties." 3 L.P.R.A. § 1336(4, 8) (Supp.1985). His removal, although it did not result in unemployment, was a removal nonetheless.

The process due to this career employee is a matter of federal, not state law. *Loudermill,* 470 U.S. at 541, 105 S.Ct. at 1493. At a minimum, Gierbolini had a procedural due process right to "some kind of hearing" prior to his removal. *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493; *Roth,* 408 U.S. at 569–70, 92 S.Ct. at 2705; *Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694; 2698–99, 33 L.Ed.2d 570 (1972).

▇▇▇ There are three elements generally required of this hearing. First, there must be oral or written notice of the charges against the employee to be terminated. Second, there must be an explanation of the substance of the relevant supporting evidence against the employee. Finally, the employee must be given the opportunity to present his side of the story. *Brock v. Roadway Express,* —— U.S. ——, ——, 107 S.Ct. 1740, 1747–49, 95 L.Ed.2d 239 (1987); *Loudermill,* 470 U.S. at 543, 105 S.Ct. at 1494. The purpose of these pretermination procedures is to ensure an "initial check against mistaken decision." *Loudermill,* 470 U.S. at 545, 105 S.Ct. at 1495. Gierbolini was provided a written explanation of the changes and some explanation of the "relevant supporting evidence" against him. The termination, however, was immediate and he was afforded no pretermination opportunity to respond. More important, the decision to terminate was not only mistaken, it was a sham. Gierbolini was deprived of property without due process of law precisely because the reasons given for his termination were false. We need not tary with any post-termination procedure that may have been afforded Gierbolini; he was deprived of property with only kangaroo process.

## B. *First Amendment Claim*

▇▇ It is impermissible to discharge or demote government employees because of their political affiliation. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). There exists an exception, however, when the political affiliation of the employee is an appropriate requirement for holding the position. *Branti v. Finkel,* 445

U.S. 507, 518, 100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574 (1980); *Jiménez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241 (1st Cir.1986) (en banc). The Court has found that Gierbolini was, in fact, demoted because of his political affiliation. The reasons given by defendants for this personnel action were not credible. *See De Choudens v. Government Development Bank,* 801 F.2d 5, 7 (1st Cir.1986) (en banc).

It remains, then, that the Court must examine whether political affiliation is an appropriate requirement for the position of Director of the Radio Station. To put it more simply, we must examine whether the directorship of the radio station appropriately entails partisan political concerns. *Jiménez Fuentes,* 807 F.2d at 242.

▇▇ We are of the considered opinion that it cannot. The Director of the Radio Station is in charge of a licensee broadcasting on the public airwaves. As such, before the Federal Communications Commission (FCC) granted the license to WIPR, it had to consider the public interest. 47 U.S.C. §§ 307(a), 309(a). Before the license can be renewed or modified, the public interest must be considered. 47 U.S.C. § 307. Operation of radio stations on public airwaves and in the public interest has been a concern of Congress since the Radio Act of 1927. 44 Stat. 1162; *see Red Lion Broadcasting v. F.C.C.,* 395 U.S. 367, 380, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). As director, Gierbolini oversaw and made editorial decisions concerning the programming for WIPR. Gierbolini was, therefore, responsible for ensuring that the public trust was well served.

This is not to say that public interest is synonomous with political interest in this case. The reverse is true. Congress and the Courts have guarded against the airwaves becoming dominated by interests who would narrow the amount and kinds of information available to the public since the Radio Act of 1927. *Red Lion,* 395 U.S. at 391, 89 S.Ct. at 1807. This applies no less to a government-owned and operated station. *Cf. Red Lion,* 395 U.S. at 390, 89 S.Ct. at 1806–07 ("It is the purpose of the First Amendment to preserve an uninhibit-

ed marketplace of ideas in which truth will ultimately prevail, rather than counterance monopolization of that market, whether it be by the Government itself or by a private licensee.")[1]

The operation of a radio station cannot impinge on partisan political concerns because it operates as a public trustee, ensuring a wide variety of views and information can be heard. *See* 47 U.S.C. § 315 (requiring equal time access for political candidates). It cannot be said that a member of the PDP would ensure "more balanced" programming than a member of the NPP. The duty to present opposing viewpoints falls equally on all broadcasters. This case presents a situation more akin to *Branti*'s football coach example.

> It is equally clear that party affiliation is not necessarily relevant to every policy-making on confidential position. The coach of a state university's football team formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats, or vice versa, no matter which party is in control of the state government."

445 U.S. at 518, 100 S.Ct. at 1295.

Here, decisions concerning programming and content are certainly policy based. The public trust that must be filled, however, cannot be overridden by political programming concerns. What is even more harrowing is the thought of a certain party possessing "its own radio station" at taxpayers' expense. The Fairness Doctrine is aimed against this evil and to require a broadcaster to possess a particular party affiliation is antithetical to the doctrine. To require the government broadcaster to possess a certain political affiliation serves no useful purpose in fulfilling the public obligations of all broadcasters. Political affiliation is, therefore, not an appropriate requirement for the position of Director of Radio Station WIPR.

The case of *Tomczak v. City of Chicago,* 765 F.2d 633 (7th Cir.1985), is in contradis-

tinction to the present case. In *Tomczak,* the Seventh Circuit found that the position of First Deputy Commissioner of the Department of Water was not protected from partisan termination. Despite the fact that the duties of the office entail provision of service to all residents, the *Tomczak* clearly saw that "[e]lections often turn on the success or failure of the incumbent to provide these services." 765 F.2d at 641. To the Seventh Circuit, ignoring this reality was "an unduly myopic view of the role of politics in the seemingly apolitical context of provision of services." *Id.* For the radio station, however, it is not a "seemingly apolitical context of provision of services." The Communications Act of 1934, the Fairness Doctrine promulgated thereunder, and case law all point to the conclusion that broadcasting, if not apolitical, is certainly not a partisan affair. There is a duty to ensure that the public can receive a balanced viewpoint from any radio station it may tune into. In the Court's mind, this fiduciary duty, *Red Lion,* 395 U.S. at 389, 89 S.Ct. at 1806, is heightened in the case of governmental radio stations. Other nations may allow the government to control the news and airwaves for the good, such as the BBC in the United Kingdom, or for ill, as in many authoritarian and totalitarian states. In America, however, our national psyche grimaces at the notion of "official information" and "government-filtered news." Democracy requires a robust and wide open discussion of all positions on the great issues of our day, and it is too important a task to let the government and the politicians who run it decide how and when those discussions may be heard, all at taxpayers' expense.

Political affiliation is not an appropriate requirement for the position of Director of the Radio Station. Gierbolini was, therefore, impermissibly discharged from his position because of his political beliefs. Defendants' preferred reasons for Gierbolini's

---

**1.** The concern over monopolization in the *Red Lion* case was on the basis of editorial control over private licensees through The Fairness Doctrine. In the instant case, governmental monopolization of the public airwaves redou-

bles the concern over private monopolization insofar as WIPR operates as an arm of the government while it sounds like a private licensee.

removal were not credible and they would not have removed Gierbolini but for his political affiliation. *De Choudens*, 801 F.2d at 7; *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1974).

## C. *Relief*

The Court finds that plaintiff is entitled to relief on both fourteenth and first amendment grounds.

The purpose behind defendants' conduct in this case was to demonstrate to the employees and those associated with the Department of Education that the power to hire, fire, manage, supervise and otherwise control employment resided in a particular political party rather than in a particular new administration. In order to accomplish such purpose, defendants had to discriminate against the plaintiff because of his political belief and in so doing, defendants knowingly and intentionally harrassed, and abused plaintiff in violation of his constitutional rights. This has been done by taking away from him the imprint of authority which carries with it the respect of subordinates, and by telling the employees and the community that those not affiliated with the Popular Democratic Party are out of power and do not deserve and should not be given the respect their positions entail. The message sent to the community in general was that they must cater to the politicians of the victorious party. Political gain was the primary purpose in mind, but in this case defendants also attempted to control the public airwaves, at the taxpayers' expense. As a result of being able to control the administration through such conduct, defendants intend to put themselves on a position to make new converts to their party, thus affecting the result of the 1988 election and perpetuating themselves in power.

The government established by the founders of our nation is a government run for the benefit of all the people, not for the purpose of perpetuating the political party in power. Executive officials who insist on violating the civil rights of government employees to replace them with their "cronies" only prove that they have put their desire to stay in power and in office ahead of all other considerations in a manner reminiscent of a "president for life" syndrome. These motives and actions contravene the constitutional mandate which aims for the continuity of democracy and, above all, the preservation of freedom.

The negative effects of patronage practice on the free and efficient functioning of our government has been vigorously noted by the highest courts of the United States and Puerto Rico. *E.g., Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547; *Juan Hermán Colón v. Corporación de Renovación Urbana y Vivienda*, 84 JTS 52 (P.R.1984). The threat latent in conditioning public employment on partisan support is well expressed in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547. First, the practice exacts a ruthless toll on the individual employee's ability to act according to his beliefs and to associate with others of like political persuasion, thus diminishing support for his political party. *Id.* at 355–6, 96 S.Ct. at 2680–1. Secondly, the free functioning of the electoral process suffers because competing political interests are not supported. The Supreme Court aptly stated the problem:

> Conditioning public employment on partisan support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs. As government employment, state or federal, becomes more pervasive, the greater the dependence on it becomes, and therefore the greater becomes the power to starve political opposition by commanding partisan support, financial and otherwise. Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant.

*Id.* at 356, 96 S.Ct. at 2681.

This Court has concluded that plaintiff should have been retained as Director of the Radio Station with a career status.

The denial of his rightful position is an irreparable injury. Should the Court order reinstatement, there would not be an undue disruption of the activities of the radio station. Gierbolini worked as Acting Director and then as probationary director from January 1980 through April 1985. He is not unqualified for the job. The public interest in this case, as noted before, would be served by a radio station free from the vagaries of politics. Reinstatement of the plaintiff would restore a directorship untainted by political selection. The Court shall enter judgment ordering, adjudging, and decreeing that defendants reinstate Gierbolini to the position of Director of the Radio Station with career civil service status, and that defendants cease and desist from this course of political discrimination.

As an integral part of this injunctive relief, the Court shall also ORDER that defendants restore plaintiff's backpay. Gierbolini suffered a reduction of his monthly salary in the amount of $216.00. Accordingly, the Court shall enter judgment against the defendants in the amount of $5,292.00, covering the period from Gierbolini's demotion on May 22, 1985, to the date of this Opinion and Order, i.e., twenty-four-and-one-half months. The Court shall further enter judgment directing defendants to continue the payment of this backpay amount, at the monthly rate of $216.00, until Gierbolini's actual reinstatement with full pay and benefits.

Plaintiff has also proven emotional distress resulting from the deprivation of his constitutional rights. He is entitled to recover compensatory damages for that deprivation. *Carey v. Piphus*, 435 U.S. 247, 263–4, 98 S.Ct. 1042, 1052–3, 55 L.Ed.2d 252 (1978); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Fernández v. Chardón*, 681 F.2d 42, 60 (1st Cir.1982). After several years of running the radio station, plaintiff was shuffled back to a subordinate position from the position of authority that he had worked hard to achieve. He had a new boss, and that boss held the position that had rightfully been his. Plaintiff is awarded $20,000.00 for these indignities.

Punitive damages are available under section 1983 when the defendants' conduct is shown to have been motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 52, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632 (1983). Punitive damages "are designed by the law to punish extraordinary misconduct." *Fishman v. Clancy*, 763 F.2d 485, 489 (1st Cir.1985). The extraordinary misconduct in this case is the defendants' assumption of control over a radio station; defendants believed they were entitled to their own politically slanted portion of the public airwaves. To accomplish this inherently antidemocratic act, they used their purported power to banish an innocent man from a job he adequately performed. Gierbolini, to defendants' minds, was nothing more than a political pawn in their attempt to control the radio station. This is indeed extraordinary misconduct and evinces an evil motive. The Court shall award punitive damages of $10,000.00.

### D. *Attorney's Fees and Costs*

As the prevailing party, plaintiff is entitled to attorney's fees and costs. 42 U.S.C. § 1985. A verified fee application shall be filed within thirty (30) days. *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (1st Cir.1984).

Judgment will be entered accordingly.

IT IS SO ORDERED.