Chandra W. WALDON, Appellant,

v.

Ann COVINGTON et al., Appellees.

No. 12671.

District of Columbia Court of Appeals.

Argued Dec. 5, 1978.

Decided May 27, 1980.

John C. LaPrade and Jeffrey C. Tuckfelt, Washington, D. C., for appellant.

Herbert O. Reid, Sr., Washington, D. C., for appellees Covington and Wiggins.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom Louis P. Robbins, Acting Corp. Counsel, Washington, D. C., at the time the brief was filed and the case was argued, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellees Mack, Williams, Russell, the Board of Trustees of the University of the District of Columbia, and the District of Columbia. David P. Sutton, Asst. Corp. Counsel, Washington, D. C., also entered an appearance for appellees.

Before NEWMAN, Chief Judge, and KELLY and HARRIS, Associate Judges.

KELLY, Associate Judge:

Appellant Chandra W. Waldon appeals the dismissal on August 22, 1977, of her complaints against appellees Ann Covington, Eugene Wiggins, Julius Mack, Ronald Williams, Wendell Russell, and the District of Columbia Board of Higher Education (BHE), now the Trustees of the University of the District of Columbia, for libel and slander, breach of contract, tortious interference with contract, intentional infliction of emotional distress, and wrongful death. We affirm.

The record shows that Edgar F. Waldon had been a professor in the Department of Communications Sciences at Federal City College (FCC) and its successor, the University of the District of Columbia (UDC), for six years, when Ann Covington was appointed chairperson of the department in 1972. Covington was apparently dissatisfied with Waldon's instructional abilities and recommended that he not be appointed to teach during the 1974 summer session. Waldon then obtained a temporary restraining order from the Superior Court requiring that the college allow him to teach that summer.[1]

In late August, Waldon was notified by appellee Wendell Russell, the president of FCC, that his contract, scheduled to expire in June 1975, would not be renewed.

On July 3, 1975, Waldon notified Russell, the BHE, and the District of Columbia Corporation Counsel that he intended to seek judicial review of his employment termination.[2] Consequently, on August 15, 1975, the BHE agreed, in writing, to restore Waldon to full teaching responsibilities and privileges, to reinstate his contract for two years, and to expunge all charges from the college records.[3]

Covington and Eugene Wiggins, the clinical coordinator of the Communications Sciences Department, balked at full compliance with the terms of the August agreement, apparently for both jurisdictional and professional reasons,[4] despite repeated requests from their FCC superiors. On Octo-

1. The summer teaching position was apparently a privilege, not a contractual right.

2. Waldon claimed he had been given insufficient notice of non-renewal.

3. Although the agreement stated that "The rights and responsibilities of the parties shall be governed by the standard procedures, policies, rules and regulations of the Board and of Federal City College . . ." and that "Dr. Waldon [would] be subject to the same evaluation procedures governing other faculty members . . .," it included a clause which made Waldon's past teaching performance at FCC "immaterial" to any future evaluation.

4. An October 6 letter from President Russell to Waldon states that attorneys from the Department indicated that there would be no compliance.

On August 25, the Department sent a memorandum noting that the "agreement [was] most unusual in that the department which evaluated Dr. Waldon's performance . . . was not consulted" and stating its concern "about the implications" of such an agreement. On September 26, Covington sent a letter to Ronald Williams, the Provost of FCC, and Julius Mack, the Dean of FCC's School of Applied and Health Related Sciences, objecting to "the devastating results" of the agreement, "namely, that the education of the students would be seriously impaired," that Waldon's assignment to two critical courses "jeopardiz[ed] the students' chances of passing the [National American Speech and Hearing Association] examination . . . [and] their chances of gaining employment." She said that it was her "deepest conviction that as academicians of higher education [they] should meet with the President and impress upon him the urgent need to rectify this situation."

ber 20, 1975, Waldon filed a complaint requesting a temporary restraining order to prevent appellees from breaching the agreement, and to require them to (1) give him keys to the departmental audiology clinic; (2) notify him of department meetings; (3) assign him to departmental committees; (4) comply with the expunction provisions of the agreement; and (5) cease having students "keep an eye on [him]" and report on his activities. The complaint also sought $20,000 in compensatory and $20,000 in punitive damages for breach of contract, tortious interference with contractual rights, intentionally "injur[ing] [him] in his chosen profession," violating his Fifth Amendment rights, and "civil conspiracy . . . to . . . deprive [him] of his contractual and constitutional rights." [5]

A temporary restraining order was issued by Judge Penn the same day. It was initially due to expire on November 4, but was extended several times, until a partial preliminary injunction was issued by Judge Fauntleroy on December 23. However, before any hearing on the actions for damages, Waldon suffered an irreversible cardiac arrest and died on April 29, 1976.

Appellant Chandra Waldon, his widow and executrix, moved to be substituted as a party plaintiff on October 22, 1976, and filed an amended complaint requesting four million dollars in compensatory and punitive damages, captioned: "for wrongful death, tortious interference with contract, breach of contract, libel, slander and defamation of character." She alleged that her husband's "cardiac arrest and failure of his other body functions resulting in his death were the direct result of the wrongful acts of the defendants." The only specific overt acts alleged to have been committed by

Covington and Wiggins, other than "conspiratorial actions," were acts of "direct and deliberate interference with [decedent's] contract rights," unspecified "physical interference with [his] rights to use [the physical facilities] . . . at [FCC]," [6] "continued harassment . . . including . . . making . . . unfounded statements, . . . [and] false written and oral charges of incompetency," and "continued threats . . . to take action to terminate [his] employment." Appellant alleged that the other appellees failed to supervise and ensure Covington's and Wiggins' obedience to the terms of either the agreement or the temporary restraining order, and that Mack, Williams and Russell conspired with Covington and Wiggins.

On March 17, 1977, appellant filed a Memorandum of Law [7] which added the following elements to the prior complaints: that appellees Covington's and Wiggins' acts constituted *intentional* interference with decedent's contract and that those acts directly caused or substantially aggravated Waldon's alleged physical injury, hypertension. An affidavit from Dr. Marcio C. Ferez was appended, stating that it was his medical opinion that decedent's hypertension was a physical injury that was "probably directly caused by the severe tension of which Dr. Waldon informed [him] on his first visit on April 6, 1976," three weeks before his fatal heart attack. Dr. Ferez' "opinion [was] that Dr. Waldon's physical condition and medical entities *[sic]* just prior to and at the time of his cardiac arrest were either *caused by or were substantially aggravated by the pressure* [he] was under at work." [8]

On April 21, 1977, appellant filed a response to appellees' motion to dismiss for

---

On forwarding this correspondence to the President, the Provost admitted that "[a]s a result of changing instructors . . . to conform to the agreement . . . students have been greatly inconvenienced."

5. Although the complaint alleged that appellee Covington had shown his records to faculty members and students, no libel or slander count was included.

6. Presumably this refers to Covington's and Wiggins' refusal to give him keys to the department audiology lab.

7. This "memorandum" seems to be an amendment to the complaint, but was not characterized as such and does not appear in the docket entries.

8. Finding an insufficient showing of intent to inflict extreme emotional distress, and no survival of the defamation claims, we need not

failure to state a claim upon which relief could be granted, stating that "the two intentional torts set forth in [her] original complaint [interference with contract, and libel and slander] survive under . . . Title 12–101 of the [D.C.] Code," and "are not alleged to be a part of [her] wrongful death claim." She also stated that the wrongful death claim, under D.C.Code 1973, § 16–2701, was based upon appellees' breaches of their duties to Waldon, "based upon [his] right to practice his profession and to enjoy the fruits of his contract" and "imposed upon them by the terms of their [jobs]." Appellant placed "particular reliance" on *Clark v. Associated Retail Credit Men*, 70 App.D.C. 183, 105 F.2d 62 (1939), and alleged that, based on Dr. Ferez' affidavit, there was a sufficient showing of physical injury to her decedent to fit within the holding of *Clark*.[9]

On August 22, 1977, after granting her motion to file a second amended complaint and considering appellant's aforementioned allegations, Judge Fauntleroy granted appellees' motions to dismiss.

 The trial court concluded that (1) neither the libel and slander nor the tortious interference with contract claims survive under D.C.Code 1973, § 12–161;[10] (2) the breach of contract claims fail against all the appellees except President Russell, for lack of privity; (3) absent any allegation that he knew of or personally committed a breach of contract, appellant failed to state a claim against President Russell;[11] (4) the Board of Trustees of the UDC is protected by the same defense of immunity as was the BHE, for which it was substituted;[12] (5) the wrongful death action is insufficient for failure to show proximate cause, physical impact, or physical injury; and (6) the *respondeat superior*[13] claim against the District does not survive the dismissal of the underlying claims against the individual defendants.[14]

Since our review of the record shows no genuine issue as to any material fact that could establish appellees' liability under any of the theories of recovery argued by appellant, we affirm the trial court's dismissal on all counts. *See* Super.Ct.Civ.R. 56(c).[15]

 Appellant's contention that she stated sufficient grounds for a cause of action against Covington and Wiggins[16] either for wrongful death or for intentional

---

address the issue of whether there was sufficient causation in this case. *See infra* note 17, at 1074–1076.

9. This argument is without merit. *Clark* does not require a showing of physical injury, but rather of appellees' intent to cause a risk of physical injury. *See Clark v. Associated Retail Credit Men, supra*, 70 App.D.C. at 186, 105 F.2d at 65. *See infra*.

10. A defamation action does not survive the death of either party. *Wender v. Hamburger*, 129 U.S.App.D.C. 256, 393 F.2d 365 (1968); *Shearer v. Bakery & Confectionery Workers' Int'l Union of America*, 111 U.S.App.D.C. 39, 294 F.2d 235 (1961). *See infra* note 17, 1078.

11. There is no liability for unintentional interference with contract. *See* W. Prosser, The Law of Torts § 129 at 934 (4th ed. 1971).

12. *See Roberson v. District of Columbia Board of Higher Education*, D.C.App., 359 A.2d 28 (1976).

13. In any event, when, as here, the employee's tortious conduct was allegedly intentional, the master is not liable unless he specifically authorized it, or "the master's affairs were being furthered by the employee's conduct." *Penn Central Transportation Co. v. Reddick*, D.C.App., 398 A.2d 27, 30 (1979).

14. The conspiracy claim was, of course, never addressed in the trial court's order, since there is no recognized independent tort action for civil conspiracy in the District of Columbia. *See Lamont v. Haig*, 192 U.S.App.D.C. 8, 20 n.73, 590 F.2d 1124, 1136 n.73 (1978).

15. The motion before the trial court was for dismissal under Super.Ct.Civ.R. 12(b)(6), for failure to state a claim upon which relief could be granted. The trial court's consideration of affidavits, memoranda, and other matters outside the pleadings, converted the motion into a Rule 56 motion for summary judgment, which governs our standard of review here. *See Smith v. Nixon*, 196 U.S.App.D.C. 276, 280, 606 F.2d 1183, 1187 (D.C.Cir.1979).

16. Both the complaints and the record make it clear that the only cognizable theory of recovery against the other appellees was vicarious liability for Covington's and Wiggins' actions. *See supra* note 13.

infliction of extreme emotional distress[17] is the only issue meriting more that cursory discussion. Although the trial court properly granted appellees' motions to dismiss these claims, its stated grounds for doing so were analytically incorrect.[18] The principal

**17.** A plaintiff is entitled to simultaneously maintain two separate causes of action upon the death of a tort victim, one under the Wrongful Death Act, D.C.Code 1973, § 16–2701, the other under the District of Columbia Survival Act, D.C.Code 1973, § 12–101. *See Strother v. District of Columbia*, D.C.App., 372 A.2d 1291, 1295 (1977); *Sornborger v. District Dental Laboratory, Inc.*, 105 U.S.App.D.C. 290, 266 F.2d 694 (1959); *Hudson v. Lazarus*, 95 U.S.App.D.C. 16, 217 F.2d 344 (1954).

However, ". . . double recovery for the same elements of damage should of course be avoided." *Runyon v. District of Columbia*, 150 U.S.App.D.C. 228, 230, 463 F.2d 1319, 1321 (1972) (quoting *Hudson v. Lazarus, supra* 95 U.S.App.D.C. at 21, 217 F.2d at 349) (recovery for equal amounts of $63,000 under both statutes permitted when the total was less than the decedent's probable future net income, discounted to present worth).

D.C.Code 1973, § 12–101 states:

On the death of a person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of action survives in favor of or against the legal representative of the deceased. In tort actions for personal injuries, the right of action is limited to damages for physical injury, excluding pain and suffering resulting therefrom.

D.C.Code 1973, § 16–2701 states, in pertinent part:

Liability; damages; prior recovery as precluding action

When, by an injury done or happening within the limits of the District, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation, and the act, neglect, or default is such as will, if death does not ensue, entitle the person injured, or if the person injured is a married woman, entitle her husband, either separately or by joining with the wife, to maintain an action and recover damages, the person . . . or corporation . . . is liable . . . for damages for the death . . ..

The damages shall be assessed with reference to the injury resulting from the act, neglect, or default causing the death, to the spouse and the next of kin of the deceased person . . . ..

The damages recoverable in a survival action are usually statutorily prescribed and are limited, particularly in those jurisdictions that also permit wrongful death actions, to compensation for the pecuniary expenses, such as medical costs and lost wages, actually accruing before death, for which the decedent himself could have recovered had he lived. *Hudson v. Lazarus, supra* (survival action recovery limit-

ed to damages for physical injury; facts showed substantial time lapse between injury and death). *E. g., State ex rel. Smith v. Greene*, 494 S.W.2d 55, 60 (Mo.1973) (wrongful death damages begin with the death of the person wronged; the survival action damages end with the death of the person wronged). *See* McCormick on Damages § 94 at 337 *et seq.* (1935); J. Stein, *Damages and Recovery: Personal Injury and Death Actions* § 270 at 610–11 (1972): "[M]ost jurisdictions limit the recovery for loss of earnings in the survival action to that which occurred prior to the death." *But cf. Hughes v. Pender*, D.C.App., 391 A.2d 259, 261 (1978) (trial court's denial of new trial on grounds of inadequate recovery affirmed when "prospective net lifetime earnings discounted to present worth" in the amount of $5200 were awarded in a survival action in which plaintiffs waived wrongful death damages).

Although a few jurisdictions allow non-pecuniary survival action damages, the District of Columbia statute expressly limits the right of action to "damages for physical injury" and excludes recovery for "pain and suffering." (The rationale for excluding emotional damages was stated by this court in *Bogen v. Green*, D.C.App., 239 A.2d 154, 155 (1968): "The deceased bore the pain and suffering and he is the only one who should be compensated. He can't take it with him.") (Citations omitted.)

As derogations from the common law, which barred the survival of tort actions after either the tortfeasor's or the victim's death and prohibited the spouse or next of kin from recovering damages arising from the death of their relative, the survival and wrongful death statutes must be strictly construed. *Pitts v. District of Columbia*, D.C.App., 391 A.2d 803, 807 (1978).

Since we find that Mrs. Waldon failed to plead any damages for the only physical injury other than death that could have been caused by the appellees' conduct—her husband's hypertension—her cause of action would ordinarily be barred under the survival act. *See* Super.Ct.Civ.R. 9(g). However, in light of the concurrent cause of action for wrongful death based on the same allegedly tortious conduct, we decline to dispose of this action on these grounds alone. *See infra* note 24, at 1078.

**18.** Without explicit reference to the intentional infliction of extreme emotional distress claim (perhaps because neither decedent's nor appellant's complaints mentioned the tort by name or claimed specific damages for its breach), the trial court held that the wrongful death claim failed for lack of proximate cause, physical injury, or impact.

reason that neither claim adequately states a cause of action is that appellant fails to establish appellees' intent to commit a tortious act.[19]

 Unlike the action for negligent infliction of extreme emotional distress, a tort long recognized in the District of Columbia, *Perry v. Capital Traction Co.*, 59 App.D.C. 42, 32 F.2d 938, *cert. denied*, 280 U.S. 577, 50 S.Ct. 31, 74 L.Ed. 627 (1929), an action for intentional infliction may be made out even in the absence of physical injury or impact.[20] However, the acts giving rise to liability for intentional infliction must be both "beyond all the bounds of decency" and "without just cause or excuse." *Clark v. Associated Retail Credit*

*Men, supra* 70 App.D.C. at 186, 105 F.2d at 65.

 Under the Restatement (Second) of Torts § 46 (1965), liability may be imposed for "extreme and outrageous conduct intentionally or recklessly [causing] severe emotional distress to another. . . ." *See* Prosser, *supra*, § 12, at 55–56. This liability "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities;" it is imposed only when the conduct goes "beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized community." Restatement, *supra* at § 46, comment d.[21]

This characterization of the grounds for limiting liability betrays a fairly common judicial misunderstanding. See 2 Harper and James, The Law of Torts 1108 *et seq.* (1956).

Both a liability-producing act (a breach of duty: negligent, intentional, or statutory) and a proximately-caused injury are necessary to impose liability. Both determinations are grounded in social policy considerations—"the practical need to draw the line somewhere." *Id.* at 1132. Furthermore, *both* inquiries must assess the "source and range of harm reasonably to be anticipated from the act." *Id.* at 1136. Both in finding adequate proximate cause, and in determining the desirability of imposing liability for the initial, allegedly wrongful, act, particularly in cases such as this, where foreseeability of harm is an element of intent, the court must look to whether the injury was foreseeably within the risk incident to the act or omission. *Id.* at 1151. However, whereas the inquiry into liability producing intent is subjective: *i. e.*, did appellees intend to cause severe emotional distress including the risk of physical injury; the inquiry as to proximate cause is objective: *i. e.*, was the "source and range of harm reasonably to be anticipated from the act." *Id.* at 1136.

The problem is further complicated when appellees' intent must be inferred from the nature of their acts and from the objective standard of whether a reasonable man performing these given acts could be presumed to have foreseen causing emotional distress and the risk of physical injury. *See Knierim v. Izzo*, 22 Ill.2d 73, 174 N.E.2d 157, 164 (1961), quoting *Slocum v. Food Fair Stores of Florida, Inc.*, 100 So.2d 396, 398 (Fla.1958): "[I]t is uniformly agreed that the determination of whether words or conduct are actionable in character is to be made on an objective rather than a subjective standard, from common acceptation." *Cf. Dunn v. Marsh*, 129 U.S.App.D.C. 245, 249, 393 F.2d 354, 358 (1968) (Leventhal, J., dissenting) (failure to comply with automotive right of way

statute analyzed as proximate cause question rather than as negligence per se); *Ross v. Hartman*, 78 U.S.App.D.C. 217, 139 F.2d 14 (1943), *cert. denied*, 321 U.S. 790, 64 S.Ct. 790, 88 L.Ed. 1080 (1944) (violation of safety statute requiring automobile ignitions to be securely locked characterized as "proximate cause" of appellant's decedent's death when unknown person drove appellee's truck away and ran over decedent), for examples of judicial confusion between the liability producing act and the proximate cause of the harm.

19. The burden of establishing and proving causation, negligence, or intent in wrongful death actions is upon the administratrix. *Skinner v. Koontz*, 109 U.S.App.D.C. 73, 284 F.2d 207 (1960); *Carmody v. Capital Traction Co.*, 43 App.D.C. 245, 253 (1915).

20. A claim for negligent infliction need no longer allege *substantial* accompanying physical injury, as was required under *Perry*. *Parrish v. United States*, 123 U.S.App.D.C. 149, 150, 357 F.2d 828, 829 (1966). *See generally Garber v. United States*, 188 U.S.App.D.C. 172, 578 F.2d 414 (1978).

21. Insults amounting to less than extreme outrage are actionable only when the defendant enjoys a special relationship to the plaintiff that compels a higher than normal duty of care, as when the defendant is a common carrier, innkeeper, or public utility, or when there is a debtor-creditor relationship, as in *Clark*. *See* Restatement, *supra* at § 48; Prosser, *supra*, § 12, at 57. There is clearly no such relationship here, despite appellant's efforts to characterize the appellees' conduct toward decedent as an abuse of a position of special trust under comment e to § 46 of the Restatement. A mere "position of superiority," like that held by an employer or supervisor vis-a-vis an employee, is not such a special relation, without more.

The leading early case allowing recovery for intentional infliction of extreme emotional distress is *Wilkinson v. Downton*, 2 Q.B.D. 57 (1897), in which a woman underwent weeks of agony, including serious and permanent physical consequences that threatened her sanity, after she was falsely told by a practical joker that her husband had broken both legs in an accident. Other landmark cases in the formulation of this tort include: *Nickerson v. Hodges*, 146 La. 735, 84 So. 37 (1920) (practical jokers buried a pot of rocks in a yard, helped an elderly woman discover it, knowing that she had a history of mental illness and that she would believe it was filled with gold, and persuaded her to deposit the pot at a local bank and open it in front of a laughing crowd); *Bielitski v. Obadiak*, 15 Sask. 153, 65 D.L.R. 627 (1922) (defendant's false story that plaintiff's son had hung himself was spread around and got back to plaintiff as the truth); and *Great Atlantic and Pacific Tea Co. v. Roch*, 160 Md. 189, 153 A. 22 (1931) (defendant's employee delivered a dead rat wrapped up as a loaf of bread to plaintiff). The common elements in these actions are deceit or falsity, a total lack of privilege, and such wantonness that it can be presumed that the defendant would foresee severe consequences; the outrageousness of the defendant's conduct is self-evident in each instance.

■ *Clark*, the landmark case in this jurisdiction, follows the historical model. As is implicit in the aforementioned cases, the intent to "purposely cause[ ] a disturbance of another's mental or emotional tranquility of so acute a nature that harmful physical consequences might be not unlikely to result" is an essential prerequisite to liability. *Clark v. Associated Retail Credit Men, supra* 70 App.D.C. at 186, 105 F.2d at 65.[22] *See* Restatement, *supra* at § 46, comment k.

■ Of course, subjective intent can rarely be proven directly; therefore, the requisite intent must be inferred, either from the very outrageousness of the defendant's acts or, for example, when the circumstances are such that "any reasonable person would have known that [emotional distress and physical harm] would result," *Wood v. United Air Lines, Inc.*, 404 F.2d 162, 165 (10th Cir. 1968) (citing *Samms v. Eccles*, 11 Utah 2d 289, 358 P.2d 344, 346–47 (1961)), or when the defendant has information that plaintiff's health is being adversely affected by his actions and nonetheless fails to desist, as in *Clark v. Associated Retail Credit Men, supra; accord, George v. Jordan Marsh Co.*, 359 Mass. 244, 268 N.E.2d 915 (1971), or from accompanying threats of physical violence, *see State Rubbish Collectors Ass'n v. Siliznoff*, 38 Cal.2d 330, 240 P.2d 282 (1952); *Ruiz v. Bertolotti*, 37 Misc.2d 1067, 236 N.Y.S.2d 854 (1962).

■ The actor's lack of privilege (of "just cause or excuse") is another element that must be assessed in determining whether his acts are so outrageous that harmful intent can be presumed.[23] *See Clark v. Associated Retail Credit Men, supra* 70 App.D.C. at 187–88, 105 F.2d at 66–67.

■ In reviewing the record in this case to determine whether there is any material fact alleged and in dispute which could support a finding that appellees intentionally inflicted extreme emotional distress on their colleague, the decedent, we find only the following acts (other than those sounding in defamation, which does not survive decedent's death, *see* note 10 *supra* ): (1) a refusal to give decedent the keys to an

22. In *Clark*, however, there was no issue of intent, since the defendant admitted, by its demurrer, "that it sought to cause not merely mental harm but physical harm as well, and that it succeeded in its purpose." · *Id.* 70 App. D.C. at 187, 105 F.2d at 66.

23. Unlike the situation in an action for defamation, privilege is not a defense but, rather, a factor in determining prima facie liability. The proper analogy, of course, is battery, as *Clark* makes clear, noting that "[t]he infliction of bodily harm by words, like its infliction by blows, may on occasion be privileged." *Id.* 70 App.D.C. at 187, 105 F.2d at 66. Thus, battery is defined as an "unpermitted" (*i. e.*, unprivileged) touching.

audiology laboratory; (2) the failure to give him adequate notice of departmental meetings; (3) threats to institute action to determine his competency with an eye to terminating his employment (presumably privileged, since decedent's employment contract provided for the possibility of such termination procedures); and (4) assigning decedent to teach classes out of his specialty "knowing full well that [this] would cause him embarrassment and difficulty." There are no specific allegations of malice nor evidence of intent in the record.

None of these allegations appears unconscionable or calculated to cause emotional distress and a concomitant risk of physical injury. "Embarrassment and difficulty" do not approach the level of foreseeable harm essential to establish appellees' intentional tort liability. Nor does a mere failure to act in accordance with the terms of an agreement to which appellees were not even parties appear to be sufficient, particularly in light of appellees' strong social policy grounds for resisting its imposition, i. e., that the quality of the students' education and the profession's ability to maintain essential standards would thereby be threatened.

Furthermore, it is clear that at least some of the continuing disputes between these parties were initiated by decedent himself. Applying a balancing test, as did the court in *Clark*, we find that "the advantage to society of preventing such harm" as appellees are here alleged to have inflicted on decedent is minimal when compared with the chilling effect of imposing liability in this kind of situation. *Clark v. Associated Retail Credit Men, supra* 70 App.D.C. at

186, 105 F.2d at 65. *Cf. Greenya v. George Washington University,* 167 U.S.App.D.C. 379, 386, 512 F.2d 556, 563, *cert. denied,* 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975): "It is well accepted that officers and faculty members of educational institutions enjoy a qualified privilege to discuss the qualifications and character of [colleagues] if . . . pertinent to the functioning of the . . . institution."

 Although intent is normally a factual question for the jury, a court must determine whether the plaintiff's allegations, viewed in the light most favorable to the plaintiff, are minimally sufficient to show the existence of such intent. *See* Harper and James, *supra* at 876. The court must "set outer limits" on what may go to the jury. *Id.* at 881. This determination necessarily involves some degree of judicial line drawing. *See supra* note 18, at 1075.

Having considered the facts in the record before us, we conclude that appellant's claim for wrongful death damages based on intentional infliction of extreme emotional distress [24] fails for insufficient indicia of the requisite intent. "The law does not, and doubtless should not, impose a general duty of care to avoid causing mental distress." *Clark v. Associated Retail Credit Men of Washington, supra* 70 App.D.C. at 185, 105 F.2d at 64. The trial court's dismissal of the action was proper.

*Affirmed.*

**24.** Our conclusion that the intentional infliction action fails obviates the need to consider whether it would be barred by the survival statute. Since D.C.Code 1973, § 12–101 precludes recovery for "pain and suffering" or other damages that are not "for physical injury," an action for intentional infliction of extreme emotional distress that does *not* result in physical injury is clearly barred. *See supra* note 17, at 1075. Whether it is *categorically* barred, i. e., regardless of whether there are physical injuries, has not been expressly decided in this jurisdiction. However, *intentional* infliction (along with defamation, which does not survive, *Wender v. Hamburger, supra* ) is

normally classified as a tort action for invasion of an interest in personality, which category of actions ordinarily do not survive. *See* Prosser, *supra,* §§ 126–127, at 900–03.

Perhaps the most appealing and logical solution to the problem of overlapping survival and wrongful death actions is that adopted, either statutorily or by judicial construction, in those states that only allow the survival of torts not resulting in *instantaneous death; torts in which* death is the only physical result must, in those states, be brought under the wrongful death death statute. *See* Stein, *supra,* § 266, at 600–03.