**James G. ABOUREZK, Plaintiff,**

v.

**NEW YORK AIRLINE, INC.,
Defendant.**

Civ. A. No. 85–4015.

United States District Court,
District of Columbia.

Jan. 31, 1989.

---

MEMORANDUM

JOHN GARRETT PENN, District Judge.

This case comes before the Court on defendant's motion for summary judgment and plaintiff's motion for partial summary judgment and the responses thereto. The Court heard argument on the motion for summary judgment. The facts of the case are set forth below.

### I

Plaintiff, James G. Abourezk (Abourezk), made a reservation on New York Air Flight 28 for October 3, 1985, which was scheduled to depart from Washington National Airport to LaGuardia Airport in New York City. Abourezk is an attorney and the purpose of his trip was to meet with a client and to attend a reception in the client's honor at the United Nations on the evening of October 3, 1985. The reception which plaintiff planned to attend was scheduled to end at about 8:00 p.m. and he intended to fly back to National Airport that same evening. Flight 28 was cancelled due to a mechanical problem and as a result of this change plaintiff boarded New York Air Flight 30, which was scheduled to depart from National Airport at 4:30 p.m. on October 3, 1985 destined for LaGuardia Airport. Flight 30 had many of the passengers for the earlier but cancelled Flight 28; it had 110 seats and there were 107 passengers aboard.

Flight 30 left the gate [1] at approximately 4:35 p.m. Under the command of Captain Dunn, Flight 30 taxied onto the runway and assumed the number one position for takeoff. After Flight 30 arrived at this position, the Captain received word from the tower that there was an "indefinite hold" [2] on flights to LaGuardia Airport. Captain Dunn gave periodic announcements to the passengers that the plane was being delayed because of bad weather in

---

**1.** At National Airport, New York Air has two gates and access to a third gate, when available, under a lease from American Airlines. American Airlines has a total of five gates at that airport all on one concourse. Pursuant to the lease if American Airlines is experiencing de-lays, it may use any or all of the gates it leases to New York Air.

**2.** An indefinite hold indicates that no planes are allowed to take off until the Federal Aviation Administration (FAA) permits them to do so.

New York City. After the delay began, Captain Dunn turned off the engines but left the air conditioning on. Passengers were allowed to walk around and to visit the cockpit to ask questions. After about an hour, he ordered the flight attendants to serve snacks and beverages.

Abourezk recognized that Flight 30 would need to leave not later than 6:00 p.m. to arrive at LaGuardia Airport in time for him to attend the reception at the United Nations which was to begin at about 5:30 p.m. or 6:00 p.m. At about 5:30 p.m. but before 6:00 p.m., he went to the cockpit and explained this to Captain Dunn. Not long after 6:00 p.m., plaintiff again went to the cockpit and informed Captain Dunn that he no longer wanted to fly to New York. Captain Dunn said he was first in line for takeoff and did not want to lose his place in line [3], but that he would see if he could obtain a car to come out to the runway to deplane plaintiff. Abourezk Dep. at 24. Not long after that, plaintiff went to the cockpit for the third time and told Captain Dunn he wanted to get off and asked if the Captain had been able to obtain a car. Captain Dunn responded that the Airport would not allow a car to come to the aircraft because of danger from jet drafts. *Id.* at 26. Dunn requested permission to go over to the hangar line to discharge the passenger.[4]

Sometime after plaintiff's third visit to the cockpit, Captain Dunn conducted a poll of the passengers. According to plaintiff Dunn asked, "How many people still want to go to New York?" The poll was conducted by passengers raising their hands or saying "yes" very loudly if they wanted to go to New York. Captain Dunn took this poll over the public address system, but the cabin door was open and he could see the passengers. Captain Dunn stated that the result of the poll "left no doubt in my mind that the majority of the passengers wanted to go to New York and they wanted to go as quickly as possible."[5] Dunn Dep. at 64. At this time it was "rush hour" at the Airport. There were a great many airplanes waiting in line for takeoff, "as far as the eye could see," according to Captain Dunn. *Id.* at 68. Additionally the number of planes arriving exceeded those taking off.

After a delay of about three hours, Flight 30 took off at 7:35 p.m. and landed an hour later at LaGuardia. Plaintiff arrived at LaGuardia too late to attend the reception at the United Nations. He waited in the terminal for over three hours until he was able to catch a flight back to National Airport. Abourezk arrived at his home at about 1:10 a.m. on October 4, 1985, whereas he had expected to get home by approximately 10:00 p.m. on October 3, 1985.

At his deposition, plaintiff stated that he felt annoyed and frustrated by this experience. Abourezk Dep. at 38. Externally, he remained calm and he does not recall telling the pilot he was upset. At the time of the incident, plaintiff was on a medically prescribed liquid diet called "Optifast" a powder mixed with water, and also a potassium supplement, which he took five times a day to lose weight. He did not take this diet with him since he did not expect to stay overnight. Plaintiff usually took the last two doses of this diet at 11:00 p.m., but because of the delay he did not take them

**3.** Dunn testified that in his experience as a commercial pilot who had been involved in numerous delays, normal procedure and policy for National Airport led him to the conclusion that he would have lost his number one position for takeoff. Dunn Dep. at 66–68.

**4.** This request to the tower was made through New York Air Operations (Operations). Dunn stated that during rush hour at the airport when many planes are attempting to communicate on the same frequency, it is easier to coordinate through Operations which can communicate with the tower via telephone. The request was

ultimately denied by the FAA. Dunn Dep. at 60–61.

**5.** The testimony of the plaintiff supports Captain Dunn's statements on this point. Abourezk Dep. at 31. However there is a factual issue with respect to the outcome of the poll. Plaintiff has offered the testimony of another passenger, Patrick Forte, who testified at his deposition that he counted approximately 85 passengers who wanted to stay in Washington. Forte Dep. at 18. The Court finds that the result of the Captain's poll is not a genuine issue of a material fact.

until he arrived home at 1:10 a.m. Plaintiff has not received any medical treatment, been hospitalized, or taken any medication as the result of his experience on Flight 30. He had not planned to eat any food on his trip and he did not ask for food during the period of the delay. No medication was taken by him during the delay, not even an aspirin. Abourezk sustained no physical injury and the incident did not aggravate any pre-existing condition. After the incident, he went off the diet for a week, but has since given it up entirely because it proved too difficult in view of his many speaking engagements.

## II

After extensive discovery, defendant moved for summary judgment on all of the claims advanced by plaintiff. Relying on both District of Columbia and Virginia law[6], defendant argues that plaintiff's claim fails to meet the applicable legal standards for false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and the award of punitive damages. Briefly, the relevant portions of defendant's arguments are set out below.[7]

Defendant contends that the law of Virginia provides that false imprisonment is restraint of one's liberty without any sufficient cause, relying on *Zayre of Virginia, Inc. v. Gowdy*, 207 Va. 47, 147 S.E.2d 710, 713 (1966); *Montgomery Ward and Co. v. Wickline*, 188 Va. 485, 50 S.E.2d 387, 388 (1948). Similarly it is argued that the District of Columbia defines the tort to be restraint by one person of the physical liberty of another without consent or legal justification. *Faniel v. Chesapeake & Potomac Telephone Co.*, 404 A.2d 147, 150 (D.C.App.1979).

Additionally, defendant relies on the principles set out in both the *Restatement (Second) of Torts* (hereinafter Restatement) and Prosser and Keeton, *Law of Torts* (5th Ed.1984) (hereinafter Prosser), in support of its arguments on the issue of false imprisonment. Namely, "[i]t seems reasonable to say that whenever a legal duty to release another from confinement can be made out, an intentional refusal to do so is sufficient for false imprisonment; but of course without such a duty there is no such tort". Prosser at 51. On the issue of intent, Prosser states:

It has been held that a mere incidental confinement due to acts directed at another purpose—as, for instance, locking the door with plaintiff inside for the sole purpose of keeping others out—is not a sufficiently important invasion of the plaintiff's interests to require the protection of the law. Since in such a case the defendant is aware that the conduct is certain to result in the confinement, it can scarcely be said that the defendant did not intend it; a better justification would appear to lie not in any lack of intent, but in a privilege to proceed reasonably about the defendant's own affairs. (footnotes omitted).

*Id.* at 53. Additionally, defendant argues that it acted pursuant to privilege as defined by Section 10 of the Restatement[8].

---

6. Under District of Columbia choice of law rules, this Court must apply a governmental interest analysis to ascertain which state has the most significant interest in the controversy. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1270 (D.C. App.1987). Although this case involves the competing interests of both Virginia and the District of Columbia law, the law of these jurisdictions do not conflict on the issues presented herein. To the extent that such a ruling is necessary, the law of the District of Columbia is controlling. *See In re Air Crash Disaster at Washington, D.C. on January 13, 1982*, 559 F.Supp. 333, 342 n. 10 (D.D.C.1983).

7. Defendant makes an extensive argument with respect to the policy ramifications of a judgment in favor of the plaintiff. In sum, defendant concludes that such a decision should be left to rulemaking by the FAA or the Metropolitan Area Airports Authority (MAAA) or that a decision by this court is preempted by federal law. For the reasons discussed in Part III, the Court need not address these arguments.

8. Section 10 of the Restatement defines a privilege as: (a) the consent of the other affected by the actor's conduct; or (b) the fact that its exercise is necessary for the protection of some interest of the actor or of the public which is of such importance as to justify the harm caused or threatened by its exercise; or (c) the fact that

In further support of these arguments defendant relies on *Herd v. Weardale Steel, Coal and Coke Co., Ltd.*, [1913] 3 K.B. 771, [1915] A.C. 67, an English appellate decision. In that case, at about 9:30 a.m., Herd, a coal miner, went down in the coal shaft to begin his day's work. When he was down in the mine, he and some other miners decided that the work they were to do was unsafe and violated their labor contract. Herd and these men refused to perform this work and, at about 11:00 a.m., they asked to be taken back to the surface. The only method of returning to the surface consisted of two cages operated by machinery which caused one cage to ascend while the other descended. The coal miners were told that they could not go back up until the end of their shift at 4:00 p.m. At the time the men requested transport to the surface, the cages were being used to carry coal and while they were being used for that purpose, neither cage could be used to carry workmen. At about 1:00 p.m., the cages had completed their work, and one of them was empty and available for the carriage of men. The mine operators forbade the workmen to enter this cage, but some of them, other than Herd, entered the cage and refused to leave. The cage was then kept stationary for about twenty minutes. Ultimately, at about 1:30 p.m., the mining company gave permission for the men to be brought up and for Herd to enter the cage, which he did. They were then raised to the surface.

The *Herd* plaintiff was detained in the mine for the period of about two and a half hours. He sued his employer for false imprisonment and the court held that there was no false imprisonment. With respect to the claim of false imprisonment the *Herd* Court concluded that Herd's claim did not fall within the parameters of the law of false imprisonment. Defendant maintains

that this case is relevant because Herd originally entered the mine voluntarily intending to perform his duties and only decided he wanted to come back up when he determined that the work he was to perform violated his labor contract. Similarly defendant points out that Abourezk entered the plane voluntarily seeking transport to New York City and only sought release when he determined that he would miss his appointment even though he was not guaranteed arrival at his destination by a certain time.

With respect to plaintiff's claims for intentional infliction of emotional distress and negligent infliction of emotional distress, defendant argues that plaintiff's claims for recovery, whether negligent or intentional, have no basis in the undisputed material facts, therefore it is entitled to summary judgment. In support of this contention, defendant states that to recover for negligent infliction of emotional distress there must be a showing of some physical injury, which is absent in this case. *See* Restatement § 436A. In this case plaintiff stated that he did not suffer any physical injury, Abourezk Dep. at 52,[9] therefore his allegation of negligent infliction of emotional distress is not legally cognizable.[10] Moreover, according to the defendant, the standard for recovery for intentional infliction of emotional distress, if not accompanied by physical injury depends upon four conditions: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there is a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe. *Naccash v. Burger*, 223 Va. 406, 290 S.E.2d 825, 830 (1982). It is argued that the District of Columbia standard is similar. *Howard University v. Best*, 484 A.2d 958, 985 (D.C.App.1984) (the

---

the actor is performing a function for the proper protection of which freedom of action is essential.

**9.** Plaintiff has submitted the affidavit of Mrs. Abourezk on the issue of physical and psychological injuries. The affidavit does not indicate any thing contrary to Abourezk's deposition on this point. Mrs. Abourezk merely declares her

observations of plaintiff's behavior after the incident.

**10.** In view of both the facts and the law on this point, the Court grants defendant's motion for summary judgment on the issue of negligent infliction of emotional distress. *Waldron v. Covington*, 415 A.2d 1070, 1076 (D.C.App.1980).

tort is defined as extreme and outrageous conduct on the part of the defendant which intentionally or recklessly causes the plaintiff severe emotional distress). Defendant contends that these conditions have not been met in this case where plaintiff was treated with courtesy by all of defendant's employees. Additionally defendant states that nothing that the Captain nor any of the other flight crew did or did not do can reasonably be called outrageous, extreme or intolerable. It is also argued that plaintiff's emotional distress was not severe since nothing has been offered by plaintiff to show that he suffered physical and mental anguish as a result of this incident. *See Jones v. Miller*, 290 A.2d 587, 590 (D.C. App.1972) (expert medical testimony may be required in determining causation).[11]

Finally, defendant argues that under the law of both the District of Columbia and the Commonwealth of Virginia, punitive damages are only allowable where a tort is aggravated by evil motive, actual malice, deliberate violence or oppression, citing *Black v. Sheraton Corp. of America*, 47 F.R.D. 263, 271 (D.D.C.1969), *aff'd*, 564 F.2d 550 (1977); *Peacock Buick, Inc. v. Durkin*, 221 Va. 1133, 277 S.E.2d 225, 227 (1981) (as a general rule, an award of punitive damages is proper only when actual malice, or malice in fact has been established by the evidence).

In response, plaintiff seeks partial summary judgment on his claim of false imprisonment and opposes defendant's motion for summary judgment. According to plaintiff, a false arrest or imprisonment occurs whenever a person is restrained or detained against his will citing *Faniel*, 404 A.2d at 147. He states that the pretrial statement of the defendant clearly indicates that plaintiff requested permission to deplane and the request was not granted prior to takeoff. Plaintiff disputes the airline's contention that the pilot's intent must have been malicious or hostile as incorrect. Intent as an element of false imprisonment

need not mean ill will or hostility. It requires only that the defendant understand that his conduct will to a substantial certainty result in confinement. According to plaintiff, the authority relied upon by defendant does not state anything contrary to this position.

Further, plaintiff argues that once he has shown imprisonment, the burden of proof shifts to the defendant to show privilege or legal justification relying on *Marshall v. District of Columbia*, 391 A.2d 1374 (D.C.1978) and *Clarke v. District of Columbia*, 311 A.2d 508 (D.C.App.1973) (allegation that plaintiff was arrested and imprisoned without process raises a presumption of unlawful restraint and the burden shifts to defendant to justify the restraint as lawful). Plaintiff asserts that defendant's actions were neither justified nor privileged. It is argued that defendant has consistently relied upon two facts in order to demonstrate its justification for refusing to deplane plaintiff. First, there was no gate available and second, that he would lose his place in line for takeoff. Plaintiff contends that there was a gate available to defendant during the critical period between 5:30 p.m. and 7:30 p.m. according to defendant's records, namely, the "New York Air Daily Operations Report", "Delay Recap Analysis", and "D.C. Station Record".[12] Moreover, the pilot of the aircraft stated at his deposition that even if a gate had been available he would have taken exactly the same action today, based upon the information made available to him. *See* Dunn Dep. at 63.

Additionally, plaintiff charges that defendant's allegation that it was justified in refusing to return to the gate because it would have lost its number one takeoff position is unsubstantiated on several grounds. First there is no evidence that the FAA maintains any such written policy at National Airport. Second, the deposition of plaintiff's expert states that any such

---

**11.** Moreover, plaintiff's deposition indicates that the incident did not aggravate any preexisting condition and he does not maintain that he suffered any psychological injury as a result of the incident. Abourezk Dep. at 52.

**12.** Defendant states that these records only indicate New York Air's occupancy of the gates, the records do not show the American Airlines planes on the concourse during the delay.

policy would be informal at best, serving only as a guideline subject to the discretion of the air traffic controllers.[13] Third, the pilot admits that he never asked the tower if he would have lost his place in line. Finally, plaintiff argues that the fact of losing one's place in line is not justification for refusing to return to the gate since defendant does not allege that it would have interfered with its duty to transport those wishing to go to New York. Plaintiff submits that defendant could have gone back to the gate and then flown to New York City.

Abourezk contends that defendant's suggestion that it may not have had a duty to release plaintiff is absurd and that its reliance on *Herd* is misplaced. First, it is argued that the *Herd* Court clearly rests its decision on contract, namely the employer's duty or lack thereof. According to plaintiff it is apparent that under the *Herd* Court's reasoning, had the employer refused to bring Herd up after the shift's end, there would have been a claim for false imprisonment. Using Abourezk's analogy, one could surmise that plaintiff voluntarily entered defendant's aircraft for one hour, the scheduled flight time between Washington National and New York, LaGuardia, as published by defendant. Anything longer than one hour, by implica-

tion was not by consent. Under this argument after 6:00 p.m. when plaintiff told Captain Dunn that he wanted to get off the aircraft, there was no doubt that the consent was withdrawn.

Further, plaintiff argues that the evidence indicates the delay was excessive based on the deposition of his expert who will testify that the delay was excessive and the failure to deplane passengers unreasonable.[14] Also, pilot Dunn described the delay as "massive"[15] and testified that in the five and a half years he had been flying with New York Air, he had experienced only one delay of greater duration on a flight between New York and Washington and that was the day after the air traffic controller's strike.[16] Dunn Dep. at 14–15. In opposing the motion for summary judgment plaintiff submits that the following are genuine issues of fact: whether there was a gate available to which defendant could have returned between the hours of 5:30 p.m. and 7:30 p.m.[17]; whether a substantial number or even a majority of the passengers wanted to deplane Flight 30 at the time the poll of the passengers was conducted; whether defendant would necessarily have lost its number one take off position in line had it returned to the gate[18]; whether other areas of the airport,

13. Plaintiff's expert acknowledged that he had no first hand knowledge of whether or not it was the normal practice at National Airport that a pilot who leaves his place in line for takeoff would have to return to the end of the line. Livingston Dep. at 49. He stated that in a general sense that's [pilots returning to the end of the line] what happens. *Id.* at 48.

14. Plaintiff's expert, who is employed as an aviation consultant, testified that he would define an inordinate delay in this case as being a delay of over an hour and a half. Livingston Dep. at 22. He stated that this was a judgment call by him, speaking as a pilot and a traveling individual. *Id.* at 23. Livingston is not aware of any regulation that would support this time period. *Id.* The Court notes that although Livingston is a pilot, his flying has been principally for military services and the FAA. *Id.* at 7. He has not "been involved in commercial passenger movement". *Id.*

15. Dunn Dep. at 64.

16. Dunn also testified to experiencing other weather related delays as a pilot for New York

Air, but he could not recall whether these delays exceeded three hours. Dunn Dep. at 15.

17. In support of this contention plaintiff relies solely on the New York Air daily logs and records produced during discovery. However, the record also reflects the testimony of Jean Campbell of New York Air Operations that there were no gates available at the time of Captain Dunn's request. Campbell Dep. at 31. Campbell had a direct view of all of the gates on the concourse via television monitor. *Id.* In her deposition she stated that her duties encompass responsibility for inbound aircraft arriving at National for New York Air, assigning gates, and time of departure including any kind of significant delays. *Id.* at 5.

18. An additional argument made by plaintiff in support of this point is the fact that Captain Dunn's testimony indicates that airplanes do not take off absolutely sequentially since planes were taking off from behind him during the delay. The record demonstrates that Captain Dunn testified that other planes with destinations that were not affected by the hold were allowed to take off. Dunn Dep. at 46.

technically defined as gate areas, could have been used to deplane passengers if such requests had been made; whether economics played a role in defendant's decision not to return to the gate to deplane passengers [19]; and whether plaintiff suffered physically and emotionally as a result of this incident. *See* Plaintiff's Reply in Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Cross–Motion for Partial Summary Judgment at 2. The crux of plaintiff's argument is that he is not suing for the delay *per se*, but for defendant's intentional and unreasonable refusal to allow him to deplane in response to an alleged excessive delay.

With respect to the plaintiff's claim for intentional infliction of emotional distress, he contends that a jury will find the defendant's behavior sufficiently outrageous and oppressive both to sustain this claim and to award punitive damages. Plaintiff offers three points in support of this contention. First, defendant refused to deplane plaintiff, second, defendant's employee testified that he would not have returned to the gate even if one were available, and third, the extraordinary length of the delay. Further, plaintiff offers his deposition and the affidavit of his wife Margaret Abourezk in support of his allegation that he has suffered physically and emotionally as a result of this incident. Finally, plaintiff argues that there is sufficient evidence in the public domain to show that airline delays and resultant passenger suffering is "out of control". He believes that the award of punitive damages in this case will prevent or greatly reduce the chance that this situation will be repeated.

### III

Pursuant to Fed.R.Civ.P. 56(e), a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations and denials of his pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Moreover, the Supreme Court has held that in the face of a motion under Rule 56, this burden requires the nonmoving party to introduce "significant, probative evidence tending to support the complaint". *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Because plaintiff has failed to make a sufficient showing of essential elements of his case with respect to which he bears the burden of proof, *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986), defendant is entitled to judgment.

With respect to the cross motions for summary judgment on the issue of whether defendant is liable for the tort of false imprisonment, the Court recognizes that since this case is one of first impression, the Court must balance the common law principles of tort in this area with an ever changing technological society. Thus, it is necessary to determine the nature of the duty of an airline pilot with regard to the release of his passengers. Obviously where vehicle and passenger safety necessitate release the pilot is under a clear duty to release all of his passengers. Similarly where medical and security concerns dictate the need for deplaning individuals, the pilot's obligation to release is also clear. However, where the passenger seeks release for a personal reason because of a lengthy delay imposed by the airport authority, the analysis becomes considerably more complex. Therefore after stripping the arguments of the parties to their most basic form, the Court concludes that defendant's reliance on *Herd* is persuasive on these facts. Although *Herd* differs in

---

**19.** There is no evidence in the record that economics was a factor in the incident at issue. Plaintiff's expert, stated that he could only speculate as to the presence of any economic factor. Livingston Dep. at 85–86. ("... there's really no way that I know that you can actually verify that this [economic factor] ... is the cause of the denial to offboard passenger.") Moreover, Captain Dunn stated on this issue, "I know that as a matter of policy we don't try to hold people hostage. We want people to come back." Dunn Dep. at 62.

some respects [20], the material issue, the right to revoke consent to a voluntary short term confinement, remains the same for both cases. Plaintiff in *Herd* pursued a claim of false imprisonment where there was clearly no contractual right to be brought out of the mine before a specific time. He entered his employer's premise voluntarily and upon an individual and unilateral determination that he could not work, Herd concluded that his employer was required to release him upon request or be sued for false imprisonment.

On the facts at bar, it is clear that there is a common law duty to release under exigent circumstances, however, Abourezk had no common law or contractual right to release under the circumstances of his request. Nor do the facts indicate that he had the right to arrive in New York City at a specific time. Thus his desire for release from the aircraft constitutes a mere request to be granted or denied by the pilot. The legal duty to release arose when the plaintiff was transported to New York City. Since the delay herein was imposed by the air traffic controller for a duration unknown [21] and indefinite through no fault of the airline, the *Herd* result should be followed in this case.

This result is consistent with *Faniel*, to the extent that false imprisonment cases involving the seizure of an individual are analogous. In *Faniel*, cited by both parties, an employee of the telephone company was questioned by her employer, during work hours, regarding her misuse of certain equipment. After admitting that she had the equipment in her home, she was driven there to recover it. On the way, a detour was made to collect another security agent. The Court considered whether the questioning of the employee constituted imprisonment and whether the trip, including the detour constituted false imprisonment. In its discussion of implied consent, that court stated that if the defendant goes beyond the implied consent, and does a

substantially different act, he will be liable. *Faniel*, 404 A.2d at 153. Moreover, that court concluded that whether the assent given was broad enough to cover the invasion inflicted is a question of fact to be determined by the jury in doubtful cases. *Id.* Ultimately, the District of Columbia Court of Appeals found the evidence insufficient as a matter of law to establish false imprisonment. On the facts at bar, plaintiff entered the plane and gave the pilot the express consent to fly him to New York City. Abourezk argues that he revoked or withdrew this consent because of the length of the delay and the fact that he no longer needed to travel to New York. However, the original consent that was given by plaintiff was broad enough to cover the pilot's determination that he would fly the plane to New York upon release of the indefinite hold. Plaintiff's agreement with the airline did not guarantee arrival at his destination by a specific time nor did it allow or provide that plaintiff could unilaterally determine that he should be deplaned in circumstances such as those presented herein.

Although the case law is sparse with respect to the issue presented herein, the Court concludes that the legal principles incorporated by the tort of false imprisonment do not embrace plaintiff's claim. It is dispositive that the airline's actions neither created nor lengthened the delay and it would be beyond the jurisdiction of the Court to impose liability simply because the pilot did not anticipate the length of an indefinite hold. Moreover, the Court is not convinced that evidence supports the proposition that the imposition of liability in this case would lessen flight delays, but in fact could lead to both chaotic requests and decisions at the airport that subordinate the primary goal of safety. In so holding, the Court does not intimate by this ruling that no set of facts in this context would constitute false imprisonment, but that in

---

**20.** For example, the period of confinement in *Herd* did not exceed the time that Herd would normally have spent in the mine, while Abourezk spent over three additional hours on the airplane in this case.

**21.** Captain Dunn testified at his deposition that the only other delay of this length he had ever experienced occurred during the air traffic controllers strike.

the case presently before the Court the common law duty to release did not arise upon plaintiff's request.

■ Based on the record before the Court, plaintiff's claim of intentional infliction of emotional distress is deficient based on the record before the Court. The tort of intentional infliction of emotional distress consists of (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress. *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33 (D.C.1982). All three elements must be proven in order to prevail in the claim. *Green v. American Broadcasting Companies*, 647 F.Supp. 1359, 1362 (D.D.C.1986). Conduct which will result in liability for the first element must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community". *Sere*, 443 A.2d at 37 (quoting Restatement (Second) of Torts, § 46, comment at 73). This liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities. *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C.1980). While it is possible to infer the second element of the tort from the level of the outrageousness of the defendant's conduct, *Sere*, 443 A.2d at 37; *Waldon*, 415 A.2d at 1077, the claimant must also establish that the defendant proximately caused an emotional disturbance "of so acute a nature that harmful physical consequences might not be unlikely to result". *Green v. American Broadcasting Companies, Inc.*, 647 F.Supp. at 1363, *quoting Clark v. Associated Retail Credit Men*, 105 F.2d 62, 65 (D.C.Cir.1939). The elements of the tort are much the same under the law of Virginia, *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974).

■ After reviewing plaintiff's claim for intentional infliction of emotional distress,

the Court is constrained to conclude that plaintiff has not met the standard set forth above. At best the record demonstrates that plaintiff was frustrated, annoyed, and upset by both the delay and the fact that he had to fly to New York only to return to the District of Columbia. However, plaintiff's allegations with respect to defendant's conduct do not rise to the level of extreme outrageousness required by *Sere*. Although Abourezk's annoyance and frustration as a result of this incident are understandable, he is not entitled to recovery from defendant for the inconveniences of modern life. Also, the record does not establish that plaintiff has suffered severe emotional distress. Plaintiff states that he has received no treatment, neither psychiatric nor physical, as a result of the incident. His deposition merely states that he either gained weight or failed to lose the appropriate amount of weight on his diet the week of the incident. Abourezk Dep. at 54. The affidavit of plaintiff's wife setting forth her observations is not probative of whether Abourezk has suffered severe emotional distress. Therefore, plaintiff has not made a sufficient showing on the essential elements of his claim in the face of a motion for summary judgment.

In view of the foregoing,[22] plaintiff's motion for partial summary judgment will be denied and defendant's motion for summary judgment will be granted.[23]

An appropriate Order accompanies this memorandum.

---

**22.** The Court need not address plaintiff's claim for punitive damages.

**23.** All other motions in this case are dismissed as moot.