**Michele E. SHEPHERD, et al., Plaintiffs,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., et al., Defendants.**

Civ. A. No. 88–954 (RCL).

United States District Court, District of Columbia.

June 13, 1994.

See also 151 F.R.D. 179.

Mark Lane, Nkechi Taifa, Washington, DC, for plaintiffs.

A. Douglas Melamed, Wilmer Cuttler & Pickering, William H. Jeffress, Jr., Randall J. Turk, J. Bradley Bennett, Miller, Cassidy, Larroca & Lewin, Washington, DC, for defendants.

## MEMORANDUM OPINION IN SUPPORT OF FINAL JUDGMENT

LAMBERTH, District Judge.

This case comes before the court on plaintiffs' original and final proposed orders for relief and defendant's oppositions to both, and other responsive documents. Upon consideration of the proposed orders, the opposi-

tions, and the entire record in this case, this court shall order that defendant ABC shall pay plaintiff Shepherd $125,000.00 in damages, shall pay plaintiff Graves $184,293.33 in damages, and shall desist from the discriminatory conduct against plaintiff Shepherd that was described in the complaint.

## I. BACKGROUND

Plaintiff Michele Shepherd is a black woman who works as a staff artist at the American Broadcasting Companies, Inc.'s ("ABC") Washington, D.C. News Bureau. Her co-plaintiff, LaRue Graves, is a black male who was fired from his position as a freelance graphic arts designer at the ABC Washington News Bureau Graphics Department in 1985. Together they brought this action for racial and sexual workplace discrimination under the District of Columbia Human Rights Act, 2 D.C.C. §§ 1–2501 et seq. (1981) ("DCHRA"). They sued the American Broadcasting Companies, Inc.; Capital Cities/ABC, Inc.; their immediate supervisor Kenneth Dyball; and ABC Washington bureau chief George Watson.

On April 15, 1992, this court granted plaintiffs a default judgment as a sanction against defendant's discovery misconduct. (Upon reconsideration in a memorandum opinion of September 3, 1993, this court modified certain elements of that holding, but the default judgment stands.) The sole issue now before the court is the size of plaintiffs' damage award.

Shepherd and Graves both seek damages against all defendants, but for reasons described below (see infra Section II), they may only collect damages from defendant ABC. Plaintiffs have several claims against ABC: for compensation for emotional injury caused by defendant's discrimination, for harms caused by defendant's allegedly unlawful retaliation, for punitive damages, for injunctive relief, and for attorney's fees and costs. Each claim is analyzed in turn below.

## II. DEFENDANTS DYBALL, WATSON, and CAPITAL CITIES

### A. Dyball and Watson

■ Plaintiffs' claims against defendants Dyball and Watson shall be dismissed for

plaintiffs' failure to prosecute. The default judgments against both Dyball and Watson were vacated upon reconsideration in September, 1993.[1] Since then, plaintiffs have done nothing to prosecute their claims against these two defendants—other than to improperly claim damages from them in their final proposed order for relief, filed several months after the vacating order.[2] Perhaps plaintiffs abandoned their claims against these two defendants because they feared that a jury—reviewing plaintiffs' allegations and Dyball's and Watson's defenses—might differ with the default judgment's determination that as a matter of law almost everything that plaintiffs have alleged is true. In any event, by failing to prosecute for over nine months after their default judgments were vacated, plaintiffs have clearly abandoned their claims against defendants Dyball and Watson.

This dismissal as to defendants Dyball and Watson is without prejudice only if the default judgment against ABC is set aside. In that case alone may plaintiffs reinstate their claims against defendants Dyball and Watson. Otherwise, they may not. Accordingly, defendants Dyball and Watson shall not be held liable for any damages or injunctive relief in the order accompanying this memorandum opinion.

### B. Capital Cities

■ The damages claims against defendant Capital Cities must be dismissed because Capital Cities is merely a shareholder of the corporate successor to defendant ABC.[3] A party seeking to claim damages from a shareholder for the wrongful acts of a corporation has the burden of showing "unity of interest and ownership." *Vuitch v. Furr,*

482 A.2d 811, 816 (D.C.App.1984) (Rogers, J.). There is no precise test for determining whether a claimant has met this burden, but plaintiffs in this case—who have presented no evidence at all on this point—certainly have not. Accordingly, Capital Cities shall not be held liable for any damages in the order accompanying this memorandum opinion.

### III. DEFENDANT ABC

■ Although a default judgment forces a defendant to concede liability, it does not force it to concede liability for the amount of damages that a plaintiff has claimed. *See* 10 Wright & Miller, *Federal Practice and Procedure* § 2688 at 450 (1983). The task now before this court is ascertaining the amount of damages plaintiffs are due from the sole remaining defendant, ABC.

■ This task can be performed without an evidentiary hearing. Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that "[i]f, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages, ... the court may conduct such hearings or order such references *as it deems necessary and proper* and shall accord a right of trial by jury to the parties when and as required by any statute of the United States."[4] In this case, this court may resolve the damages claims on the papers alone, without wasting the judicial resources required of holding a live hearing on the issue. The record in this case is extremely thorough and contains volumes of detailed deposition testimony. The parties have painstakingly combed this testimony for relevant facts and have presented them well

1. Mem.Op. of Sept. 3, 1993, 151 F.R.D. 194, 214–215.

2. Plaintiffs' final proposed order for relief requests the award of all damages set forth in their original proposed order for relief, which claims damages from defendants Dyball and Watson. Pls.' Final Proposed Order for Relief at 52.

3. Plaintiffs named ABC, Inc., a New York corporation ("ABC New York"), in the complaint as a defendant. However, ABC New York became an indirect wholly owned subsidiary of Capital Cities on January 3, 1993 through a merger. Later,

after the assets of ABC New York were transferred to ABC, Inc., a Delaware corporation ("ABC Delaware"), ABC New York was dissolved.

4. Fed.R.Civ.Proc. 55(b)(2) (emphasis added). The parties are clearly not entitled to a jury trial on the damages question. The sole federal statute that entitles defaulted parties to a jury damages trial is 28 U.S.C. § 1874, which governs actions to recover for certain forfeitures. *See* 10 Wright & Miller, *Federal Practice and Procedure* § 2688 at 452 (1983).

in memoranda for the court. Significantly, few of the issues resolved below hinge on witness credibility such that judging demeanor in live testimony would be a necessary adjunct to the sworn written testimony already before the court. The court is intimately familiar with the facts of this case, having presided over it since 1988. All of this makes the complete record a suitable substitute for live testimony and makes it possible for damages to be ascertained without the added litigation costs of a live hearing.

### A. Compensatory Damages

■ By virtue of the default judgment against ABC, ABC is held to have violated the District of Columbia Human Rights Act. Concededly, the default judgment, which rendered judgment for plaintiffs because of defendant's misconduct in discovery, did not expressly rule on any of the allegations of discrimination underlying plaintiffs' damage claims. Nevertheless, "so long as the facts as painted by the complaint 'might . . . have been the case' they may not now be successfully controverted."[5] After default, allegations will be taken as true if they are "well-pleaded," that is, if they are not made "indefinite or erroneous by other allegations in the same complaint," not contradicted by " 'indisputable facts' . . . which could not possibly be rebutted if the non-defaulting party were permitted a trial," not contrary to uncontested facts in the record, and provable by legitimate evidence. *Hughes*, 449 F.2d at 63.

Plaintiffs' complaint states well-pleaded allegations of racial discrimination against Graves (Complaint at ¶¶ 27–41) and racial

and sexual discrimination against Shepherd (Complaint at ¶¶ 9–25). The discrimination allegations are, of course, hotly disputed by defendant, but the time for such disputes is past. "There was a time for that and [the defaulted party] cannot elect to default and then defend on the merits. It cannot have its cake and eat it too." *Hughes*, 449 F.2d at 63–64.

As victims of employment discrimination, plaintiffs are entitled under the D.C. Human Rights Act to compensatory damages and other such remedies as may be appropriate,[6] which may include, among other things, backpay and reinstatement.[7] The court turns now to each plaintiffs' compensatory damages claims.

#### 1. Shepherd's Compensatory Damages Claim

Shepherd claims $1,000,000 in compensatory damages for defendant's discrimination against her.[8] Her claim rests on her contention that defendant's racial and sexual discrimination caused her to suffer from posttraumatic stress disorder ("PTSD"). As discussed below, her PTSD claim is so implausible that as a matter of law it must be denied. Nevertheless, she is entitled to a more modest award for the mental distress that she clearly did suffer.

#### a. PTSD

■ PTSD claims may be denied as a matter of law if the underlying allegations, even if taken as true, simply could not have induced the trauma necessary to trigger PTSD.[9] Because Shepherd's claims do not

---

**5.** *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 64 (2d Cir.1971) (quoting *Thomson v. Wooster*, 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885)), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

**6.** 2 D.C.Code § 1–2556 (Supp.1994).

**7.** 2 D.C.Code §§ 1–2556(b), 1–2553(a) (1981 and Supp.1994).

**8.** She claims $500,000 of this amount for "intentional infliction of emotional distress" caused by defendant's discrimination. She claims the other $500,000 for "unlawful discriminatory practices in employment." (Pls.' Proposed Order for Relief at 2–3.) The court will construe this sec-

ond claim as a part of her claim for compensatory damages for emotional distress.

**9.** *See, e.g., Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1210 (6th Cir.1988) (reversing as a matter of law an award of PTSD damages for drinking contaminated water, after subjecting the PTSD claim to "the closest scrutiny" and requiring plaintiff to show that the "particular event constitutes a 'recognized stressor' or a psychologically traumatic event which would produce significant symptoms of distress in almost everyone experiencing such an event.")

Non-traumatic harassment has been held not to cause PTSD as a matter of law. For example, sexually suggestive remarks on the job, adverse

rise to the trauma-inducing level, her PTSD claim must be denied.

The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (3d rev. ed.) ("DSM–III–R") [10] defines PTSD as follows: [11]

The essential feature of this disorder is the development of characteristic symptoms following a psychologically distressing event that is outside the range of usual human experience (*i.e.*, outside the range of such common experiences as simple bereavement, chronic illness, business losses, and marital conflict). The stressor producing this syndrome would be markedly distressing to almost anyone, and is usually experienced with intense fear, terror, and helplessness....

The most common traumata involve either a serious threat to one's life or physical integrity; serious threat or harm to one's children, spouse, or other close relatives and friends; sudden destruction of one's home or community; or seeing another person who has recently been, or is being, seriously injured or killed as the result of an accident or physical violence. In some cases the trauma may be learning about a serious threat or harm to a close friend or relative, *e.g.*, that one's child has been kidnapped, tortured, or killed.

The trauma may be experienced alone (*e.g.*, rape or assault) or in the company of groups of people (*e.g.*, military combat). Stressors producing this disorder include natural disasters (*e.g.*, floods, earthquakes), accidental disasters (*e.g.*, car accidents with serious physical injury, airplane crashes, large fires, collapse of physical structures), or deliberately caused disasters (*e.g.*, bombing, torture, death camps). Some stressors frequently produce the disorder (*e.g.*, torture) and others produce it only occasionally (*e.g.*, natural disasters or car accidents).

Shepherd's traumata are simply not severe enough to meet this standard. Her psychiatrist, Dr. Hamlin, testified that the traumata in her case included some physical stressors—including the explosive, drunken behavior of Dyball, her supervisor; his cursing; his tearing or burning of her work or his talking loudly in her face—and some nonphysical stressors—including Dyball's giving others credit for her work, and his giving her the silent treatment. (Shepherd Aff. at ¶ 25 (quoting Hamlin Depo. at 155) (Ex. A to Pls.' Proposed Order for Relief).) Shepherd herself attributes her PTSD to Dyball's practice of permitting and making racist and sexist jokes, cartoons, and remarks; the onerous schedule and inadequate facilities she had to work with; and the facts that she was forced to witness the burning of her work, endure unfounded criticism of her work, and undergo remedial training designed to humiliate her. (Pls.' Proposed Order for Relief at 10.) All these and other stressors created a "hostile, intimidating and discriminatory work environment" that triggered her PTSD. (Shep.

---

performance appraisals, and reprimands have been held not to trigger PTSD. *See Broderick v. Ruder*, 685 F.Supp. 1269, 1273 n. 3 (D.D.C. 1988).

More traumatic sexual discrimination, by contrast, has been found to trigger PTSD. For example, in *Hansel v. Public Serv. Co.*, 778 F.Supp. 1126, 1128–31 (D.Colo.1991), a plaintiff who was repeatedly sexually assaulted on the job and was held down inside a car by one male employee while another fondled her genitals, was found to have PTSD.

**10.** This publication has been relied upon by the courts. *See, e.g., United States v. Fazzini*, 871 F.2d 635, 638–39 (7th Cir.1989), *cert. denied*, 493 U.S. 982, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989). Plaintiffs contest the authority of the DSM–III–R, pointing out that a recent edition of the treatise is confessedly imprecise: "In DSM–III there is no assumption that each mental disorder is a discrete entity with sharp boundaries (discontinuity) between it and other mental disorders, as well as between it and No Mental Disorder." (Introduction to DSM–III at 6 (Ex. B to Ex. C to Pls.' Final Proposed Order for Relief).)

However, plaintiffs do not assert that the PTSD definition in *DSM–III–R* is *too imprecise* to apply to the particular facts of this case. Tellingly, plaintiffs do not contend that the treatise they appear to prefer—the *International Classification of Diseases*—defines PTSD any differently from the DSM–III–R. (Pls.' Final Proposed Order for Relief at 13–14.) Further, the psychologist favored by Shepherd's co-plaintiff, Graves, relies on the DSM–III–R. (Brown Decl. at ¶ 2.)

**11.** DSM–III–R at § 309–89 (Post–Traumatic Stress Disorder) (Ex. 2 to Ex. E of Def.'s Opp'n to Pls.' Proposed Order for Relief).

Aff at ¶ 13 (Ex. 1 to Pls.' Proposed Order for Relief).)

Even if all of these allegations are taken as true, Shepherd could not have suffered PTSD. None of her claimed traumata are the sort of "psychologically distressing event that is outside the range of usual human experience" that trigger PTSD. (DSM–III–R at § 309–89.) They did not trigger anything like the "intense fear, terror, and helplessness" associated with PTSD. Serious threats to life or limb like kidnapping, torture or murder may trigger PTSD. Ugly and inexcusable sexist and racist jokes and insults—although deplorable (and, in this case, actionable and compensable)—generally do not trigger PTSD. Shepherd has made no special showing that her case is exceptional.

Further, the facts that she has since functioned well in her job under the very people she claims traumatized her and that she never sought psychiatric help [12] also mitigate against a finding of PTSD in her case. In sum, Shepherd need not have been traumatized to show racial or sexual discrimination under District of Columbia law,[13] but she must have been traumatized to show that she suffers post-traumatic stress. Accordingly, Shepherd's PTSD claim shall denied as a matter of law.

### b. Intentional Infliction of Emotional Distress

 Although Shepherd cannot show that defendant's discrimination traumatized her, she can show that defendant's acts intentionally caused her severe emotional distress. In order to make this showing, she must demonstrate that (1) defendant's extreme and outrageous conduct (2) intentionally or recklessly (3) caused her severe emotional distress. See, e.g., Abourezk v. New York Airline, Inc., 705 F.Supp. 656, 665 (D.D.C.1989), aff'd, 895 F.2d 1456 (D.C.Cir. 1990); Green v. ABC, 647 F.Supp. 1359, 1362 (D.D.C.1986). Of course, "mere employee-employer conflicts, even those marked by charges of sexual harassment, are not necessarily characterized by the degree of serious misconduct that gives rise to" the tort of intentional infliction of emotional distress. Green, 647 F.Supp. at 1362. "But a pattern of harassment that violates public policy may, if serious enough to constitute 'extreme and outrageous conduct,' rise to intentional infliction of emotional distress by an employer." Id. at 1362–63.

 The timely and well-pleaded allegations [14] stated in Shepherd's complaint es-

---

**12.** She sought no psychiatric help, although she did seek a "psychiatric forensic evaluation of [her] mental and emotional health" from Dr. Willie T. Hamlin, M.D., who was deposed for this lawsuit on July 5, 1989 (Shepherd Aff. at ¶ 11 (Ex. 1 to Pls.' Proposed Order for Relief)).

Shepherd claims that she did not seek psychiatric help because she could not afford it (Shep. Aff. at ¶ 21 (Ex. 1 to Pls.' Proposed Order for Relief)). However, she was covered by ABC health insurance plans that would have covered a portion of the cost of psychiatric care (Salerno Decl. at ¶¶ 2–3 (Ex. F to Def.'s Opp'n to Pls.' Proposed Order for Relief)), and she could have taken advantage of the services of the D.C. Institute for Mental Health, which offers psychiatric counseling and treatment for reduced fees (Blank Decl. at ¶ 24 (Ex. E to Def.'s Opp'n to Pls.' Proposed Order for Relief); Dennison Decl. at ¶¶ 5, 7 (Ex. G to Def.'s Opp'n to Pls.' Proposed Order for Relief)).

**13.** Cf. Harris v. Forklift Systems, Inc., —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Title VII context).

**14.** Defendant argues that most of Shepherd's allegations are untimely and that some of her allegations are not well-pleaded.

Defendant's first argument is that because only four of Shepherd's allegations are timely, she deserves compensation for those alone. The statute of limitations for actions under the Human Rights Act, and for intentional infliction of emotional distress claims based on Human Rights Act violations, is one year. See, e.g., Weiss v. International Broth. of Elec. Workers, 729 F.Supp. 144, 145, 147 (D.D.C.1990). Many of the episodes of discrimination against Shepherd occurred more than a year before she filed this action.

Yet Shepherd has avoided this bar by showing that the older episodes of discrimination and the episodes that fall within the limitations period constitute a single, continuing violation. "To prove a continuing violation, [plaintiff must] show 'a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both be-

tablish all three elements of her claim of intentional infliction of emotional distress. (Complaint at ¶¶ 70, 75.) Such allegations are not undermined by any of her other allegations, nor by evidence of which the court takes judicial note, or by any uncontested facts in the record. At best, her allegations of intentional infliction of emotional distress are contested vigorously by defendant, but after default such disputes are irrelevant to the calculation of damages.

The evidence of her emotional pain, outlined above, establishes the degree of harm caused by defendant's intentional infliction of emotional distress. Although Shepherd could not reasonably have suffered PTSD from defendant's actions, the court can easily see that her well-pleaded allegations—for example, that unlike less senior non-black males in the division, Dyball gave her inadequate and inferior workspace; that he diverted prestigious and important projects away from females in his division; that he treated her more coldly and rudely than non-black males in the division; that he gave her written warnings for poor performance when non-black males who performed poorly never

received such warnings; that he accused her in public of failing to work her hours and that he gave others credit for her work; that he refused her overtime compensation that he gave to non-black males; that he tore up and burned her work and wrote childish, sarcastic and derogatory comments on it and forced her to take humiliating remedial training (Complaint at ¶¶ 14–21)—caused her serious emotional distress.

 For the mental distress that she clearly did suffer, Shepherd shall be awarded $75,000. Shepherd's proposed orders for relief claim $1,000,000 in compensatory damages from ABC for intentional infliction of emotional distress, yet without citing any precedent indicating whether this an appropriate award. Defendant, by contrast, has offered this court extensive research which indicates that the range of awards for racial and sexual discrimination on the job is generally between $10,000 and $50,000.[15] This court's independent research shows that emotional distress awards for plaintiffs who have suffered employment discrimination—but who have not lost their jobs because of it—run the full gamut from $2,500[16] to $100,-

fore and during the [limitations] period.'" *Valentino v. United States Postal Service*, 674 F.2d 56, 65 (D.C.Cir.1982) (citations omitted). It is not enough to simply show "a series of allegedly discriminatory actions against the same employee, even with the same alleged motive such as sex discrimination." *Stoller v. Marsh*, 682 F.2d 971, 975 (D.C.Cir.1982), *cert. denied*, 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 787 (1983). The discrete events of discrimination must be linked to each other to form "a single, continuous policy" of discrimination to defeat the limitations bar. *Stoller*, 682 F.2d at 975.

In Shepherd's case, most of the individual acts of discrimination—both before and after the limitations period—were committed by the same supervisor or by others in his office. Thus the discriminatory acts are not "separate and distinct," but joined into a single, continuous discriminatory policy. Accordingly, none of her allegations are time-barred.

Defendant's second argument is that Shepherd does not merit compensation for allegations that were not well-pleaded. For example, defendant contends that because Shepherd did not personally hear the racist remark that Dyball allegedly made to another graphic artist, the comment is hearsay and her allegation of it is not well-pleaded because it is not susceptible of proof by legitimate evidence. *See Hughes*, 449 F.2d at 63. Even if defendant is correct, the argument de-

feats only a very small fraction of Shepherd's allegations of discrimination. The rest stand, and her award represents compensation for those.

15. Def.'s Opp'n to Pls.' Proposed Order for Relief at 22 n. 41 (citing *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 955 (2d Cir.1988) (upholding $50,000 award of compensatory, nonpecuniary damages); *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1017–18 (8th Cir.1988) (upholding awards of $15,000 and $20,000); *Hunter v. Allis-Chambers Corp.*, 797 F.2d 1417, 1425 (7th Cir. 1986) (upholding jury award of $25,000); *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1313–14 (7th Cir.1985) (reducing $74,000 award to $35,000); *Carter v. Duncan–Huggins, Inc.*, 727 F.2d 1225, 1238 (D.C.Cir.1984) (upholding $10,000 award); *Foster v. MCI Telecommunications Corp.*, 555 F.Supp. 330, 337 (D.Colo.1983), *aff'd*, 773 F.2d 1116 (10th Cir.1985) (awarding $50,000)).

16. *See Shaw v. Nebraska Dep't of Correctional Services*, 666 F.Supp. 1330, 1340 (D.Neb.1987). The award was based on plaintiff's testimony that the discrimination that blocked her promotion stunned her, reduced her work motivation, killed her enthusiasm, injured her self-esteem, and caused her to take sick leave, to lose sleep for months, and to suffer stress headaches. The court noted that there was no evidence that

000,[17] with a variety of awards from $5,000 and $20,000 in between.[18] Shepherd is entitled to an award at the upper end of this range. The public accusations that she endured, her embarrassment at receiving inferior workspace and unimportant work because she was a woman, the humiliating remedial training she was forced to take, and the many other insults she suffered at her job all injured her emotionally and entitle her to a substantial amount to make her whole. The amount this court shall award Shepherd—$75,000—is at the upper end of the award range, but it is not at all unprecedented.[19]

anyone noticed a change in her behavior or heard her complain.

17. *See Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir.1985). A $100,000 compensatory damages award for humiliation and emotional distress—based on evidence that plaintiff "suffered emotional stress, loss of sleep, marital strain and humiliation because of violation of his civil rights"—was upheld on appeal. Defendants had failed to promote plaintiff to administrative positions. Defendants argued on appeal that the lack of any evidence that plaintiff ever missed work, found professional help, or faltered in his personal relationships undermined the award; plaintiff answered that he carefully avoided giving defendant any cause for failing to promote him.

*See also Lowery v. WMC–TV*, 658 F.Supp. 1240, 1266–67 (W.D.Tenn.1987), *vacated by settlement*, 661 F.Supp. 65 (W.D.Tenn.1987). After a bench trial, the court awarded plaintiff—a black television news anchor who was denied promotion and otherwise discriminated against—$100,000 in compensatory damages for embarrassment, humiliation and mental anguish. Plaintiff had been demoted (not fired) from his position. The award was based on evidence including "[t]he ultimate in humiliation ... when Lowery was forced from his on-air responsibilities in the wake of his filing of his Title VII lawsuit. Such action shamed Mr. Lowery before his coworkers and the community and had an obvious devastating effect upon him. Prior to this, Mr. Lowery was continually humiliated and embarrassed by being passed over for promotion, being denied an employment contract, and being paid less than similarly situated white employees."

18. In order of the awarded amount, a sampling of such cases is as follows:

*Gierbolini Colon v. Aponte Roque*, 666 F.Supp. 334, 341 (D.Puerto Rico 1987), *aff'd*, 848 F.2d

### 2. Graves's Compensatory Damages Claims

Graves has two classes of compensatory damages claims: one for PTSD or intentional infliction of emotional distress,[20] and one for backpay and reinstatement to his job at ABC. The first of these two claims is based largely on the same incredible evidence of PTSD that Shepherd attempted to use. It fails for the same reasons here. Nevertheless, Graves's evidence does support the more modest award of $100,000 for the intentional infliction of emotional distress. His second claim—for backpay—shall be granted in part, and his claim for reinstatement shall be denied.

331 (1st Cir.P.R.1988). After a bench trial, court awarded plaintiff $20,000 for the "indignities" of being "shuffled back to a subordinate position from the position of authority that he had worked hard to achieve" and of being subordinated to a boss whose job the court believed plaintiff should have had. (Although plaintiff was demoted from his position as director of a public radio station, this was not a racial or sexual discrimination case. Plaintiff sued under § 1983 for violation of his constitutional rights to due process and to freedom of association and belief.)

*Cygnar v. City of Chicago*, 659 F.Supp. 320, 324 (N.D.Ill.1987), *aff'd in relevant part and rev'd in part*, 865 F.2d 827 (7th Cir.1989). Plaintiff Flanagan, a white male police officer who was transferred and replaced by a black police officer, was entitled to no more than $15,000 in compensatory damages. The court held that it would grant defendant's motion for a new trial unless plaintiff agreed to a remittitur to $15,000.

*Hernandez v. Hill Country Telephone Co-op., Inc.*, 849 F.2d 139, 143–44 (5th Cir.1988). A $5,000 compensatory damages award for mental anguish, based on evidence of "the emotional problems stemming from his employment difficulties," was upheld on appeal.

19. *See supra* note 17.

20. He claims $500,000 for "intentional infliction of emotional distress," and claims another $250,000 for "unlawful discriminatory practices in employment." (Pls.' Proposed Order for Relief at 2–3.) Like Shepherd's request, Graves's claim for "discrimination" damages will be construed as a claim for compensation for emotional distress. *See supra* note 8.

*a. PTSD and Intentional Infliction of Emotional Distress*

██ Graves's claim that he suffers from PTSD [21] is as incredible as Shepherd's claim. Graves's psychologist, Dr. J. Theodore Brown, Jr., does not assert that Graves suffers from PTSD. (Brown Decl. (Ex. D to Pl.'s Final Proposed Order for Relief).) Because the evidence of Graves's own psychologist does not establish even a *prima facie* case for his PTSD claim, the claim shall be dismissed as a matter of law.

██ Yet Dr. Brown's testimony does establish that defendant's racism caused Graves other emotional harms. To recover for intentional infliction of emotional distress, Graves—like Shepherd—must show that (1) defendant's extreme and outrageous conduct (2) intentionally or recklessly (3) caused him severe emotional distress. *See, e.g., Abourezk,* 705 F.Supp. at 665. His well-pleaded allegations satisfy all three elements of his claim.[22] None of these allegations are undermined by any other of the complaint's allegations, nor by evidence of which the court takes judicial note, or by any uncontested facts in the record. Of course, his allegations of intentional infliction of emotional distress are contested vigorously by defendant, but after default it is too late for such disputes on the merits.

The evidence that Graves submitted in the damages stage of this litigation permits this court to determine the degree of his emotional harm and to fix an award accordingly. His psychiatrist Dr. Brown found that "[a]fter losing the position at ABC Mr. Graves also lost his hair, appetite, interest in sex, interest in eating, ability to get a good night's sleep, professional enthusiasm and motivation, sense of humor, optimistic attitude, fiancee, sense of independence, confidence, etc. desire to socialize.... [I]t is requiring almost all his emotional energy to be able to function in daily activity of living.... All indications are that Mr. Graves was adversely affected by his termination from ABC and remains so [affected] at this time." (Brown Decl. at 4 (Ex. D to Pls.' Final Proposed Order for Relief).) The competing testimony of defendant's psychiatrist, Dr. Blank, does not entirely refute Graves's claim.[23] Dr. Blank found that although being fired from ABC did not trigger any "psychiatric pathology," it did cause the "normal grief and anger following a significant loss." (Blank Decl. at 8 (Ex. 14 to Def.'s Reply to Pls.' Final Proposed Order for Relief).)

For this emotional suffering, Graves is entitled to compensation. Awards of non-pecuniary compensatory damages for plaintiffs who have lost their jobs as a result of employment discrimination tend to vary from $500 to $52,600 according to defendant,[24] and go as high as $123,000, according to this court's independent research.[25] For the

21. Although Graves never claims outright that he suffers from PTSD, he compares his emotional plight to Shepherd's (Graves Decl. at ¶ 23 (Ex. 2 to Pls.' Proposed Order for Relief)) and his briefs dispute defendant's contention that he does not have PTSD (*see, e.g.,* Pls.' Final Proposed Order for Relief at 17).

22. Complaint at ¶¶ 32–39, 76–82. The complaint alleges, for example, that defendant ABC "intentionally engaged in outrageous conduct in regard to the plaintiff Graves [including] a continuous course of conduct constituting unlawful discrimination on the basis of race" (¶¶ 77–78) and that "the aforementioned outrageous conduct was intended by the defendants to cause and in fact did cause severe emotional distress to the plaintiff Graves" (¶ 79).

23. Plaintiffs argue that Dr. Blank's statements should be stricken as unsworn. Although Fed. R.Civ.Proc. 35 does not require experts' reports to be sworn, defendant has since resubmitted Dr. Blank's statements in sworn form to answer plaintiffs' objections. *See* Ex. 13, 14 to Def.'s Reply to Pls.' Final Proposed Order for Relief.

24. Def.'s Opp'n to Pls.' Proposed Order for Relief at 37 & n. 66. Defendant cites *Webb v. City of Chester,* 813 F.2d 824, 836–37 nn. 3 & 4 (7th Cir.1987) (affirming award of $20,250 for embarrassment and humiliation to a plaintiff who was fired due to sex discrimination, and collecting cases awarding $500 to $52,644.80 in non-pecuniary compensatory damages to plaintiffs who lost jobs due to discrimination) and *Block v. R.H. Macy & Co.,* 712 F.2d 1241, 1245 (8th Cir.1983) (affirming $12,402 award for mental anguish and humiliation to plaintiff for racial discrimination).

25. In order of the awarded amount, a sampling of such cases is as follows:

*Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 204 (1st Cir.1987). The court affirmed a jury award of $123,000 for intentional infliction of emotional distress associated with, among other things, financial and emotional problems accompanying plaintiff's discharge.

Defendant commendably cited this high-award case in its opposition to plaintiffs' proposed order for relief.

· *Grubb v. W.A. Foote Memorial Hosp., Inc.,* 759 F.2d 546, 547 (6th Cir.), *cert. denied,* 474 U.S.

grief and anger that Graves suffered by losing his job because of racial discrimination, Graves shall be granted an award of compensatory damages that is safely within the range: $100,000.

### b. Backpay and Reinstatement

Graves seeks an award of backpay from November 1985, the date he was fired, to the present. He asserts that from November 19, 1985 to December 31, 1993, he lost $274,834.52 in earnings.[26] He seeks that amount less the approximately $25,000 that he has earned in various jobs since ABC fired him.

### i. Amount of Lost Income

■ ABC argues that even if it had not fired Graves, he would have lost his job five months later anyway in an across-the-board layoff of freelance graphic artists at ABC's Washington News Bureau, and that Graves is accordingly entitled only to the income he would have earned from the date he was fired until the date of the general layoff, in April 1986. *See, e.g., Bartek v. Urban Redevelopment Authority of Pittsburgh*, 882 F.2d

739, 746–47 (3d Cir.1989). Yet ABC rehired several of those it laid off, and as an artist who (he believes) would likely have been rehired absent defendant's racism, Graves argues that he is entitled to backpay accruing from the layoff to the present.

Defendant, who has the burden of establishing by a preponderance of the evidence that Graves would not have been rehired,[27] concedes that since the April 1986 layoff, it has rehired freelance graphic artists for occasional, part-time work. (Def.'s Opp'n to Pls.' Proposed Order for Relief at 40 n. 72.) According to Graves, ABC rehired two of the freelance workers who were laid off, and ABC has hired at least ten artists (some freelance and some permanent) since April 1986. (Pls.' Final Proposed Order at 34.)

Yet Graves used to be a full-time freelance graphic artist, and none of the rehiring has restored that position. Since the April 1986 layoff, ABC has hired only occasional part-time freelance graphic artists, not full-time freelance graphic artists. (Dyball Decl. at ¶ 5 (Ex. 18 to Def.'s Reply to Pls.' Final Proposed Order for Relief)).[28] Defendants

946, 106 S.Ct. 342, 88 L.Ed.2d 289 (1985). A $25,000 compensatory damages award for emotional distress and other harms was affirmed on appeal. The award, granted after a bench trial, was based on the testimony of plaintiff, a 64-year-old black male. He testified that his superior used the word "niggers" in conversation with him, told him that a black man could not supervise white women, and kept him in the dark about the pending elimination of his position. 533 F.Supp. 671, 676 (E.D.Mich.1981).

*Hunter v. Allis–Chambers Corp.*, 797 F.2d 1417, 1425 (7th Cir.1986). The court upheld an award of $25,000 for compensatory, non-pecuniary damages for a black employee who was fired for filing a complaint alleging racial harassment.

*Reeder–Baker v. Lincoln Nat'l Corp.*, 649 F.Supp. 647, 662 (N.D.Ind.1986), *aff'd*, 834 F.2d 1373 (7th Cir.1987). After a bench trial, the court awarded plaintiff $10,000 in compensatory damages for humiliation and emotional distress flowing from plaintiff's being fired in retaliation for filing of Title VII suit. As a result of the stress caused by defendant's discrimination and retaliation, plaintiff's marriage broke up, her car was repossessed, she suffered severe tension headaches and a nervous rash (both requiring medical attention), she suffered depression and exhaustion, and she lost her independence and had to rely on her parents to support her and her children.

*Pollard v. Rea Magnet Wire Co., Inc.*, 674 F.Supp. 645, 655 (N.D.Ind.1986), *rev'd*, 824 F.2d 557 (7th Cir.1987). Plaintiff was awarded $5,000 in compensatory damages for humiliation and emotional distress. The evidence of harm included plaintiff's humiliation in telling his children that he had been fired, the cutting off of his utilities and his need to borrow a kerosene heater to heat his family's home, and his inability to buy Christmas or birthday gifts for his children. His children had to go to their grandparents' home for showers. He became moody and extremely unhappy. The court noted that there were no out-of-pocket expenses incurred. (The Seventh Circuit reversed, finding no actionable discrimination. Having reversed on the merits, the appellate court of course said nothing about the district court's calculation of damages.)

**26.** Appendix A to Graves Aff. (Ex. E to Pls.' Final Proposed Order for Relief).

**27.** *See, e.g., Lewis v. Smith*, 731 F.2d 1535, 1539 (11th Cir.1984); *Bartek*, 882 F.2d at 746. *See also E.E.O.C. v. A.F.G.E.*, 657 F.Supp. 742, 745 (W.D.Tex.1987) (defendant carrying this burden of proof).

**28.** The court credits Dyball's sworn statements on this issue, despite the aspersions that plaintiffs have cast in pages 14–23 of their Opposition to Defendant's Motion for Leave to File a Reply to Plaintiffs' Final Proposed Order for Relief.

have not re-hired anyone to do the same job that Graves lost five months before the general layoff.

Graves argues in the alternative that had ABC not fired him in November 1985, he would likely have been promoted into a staff position that survived the April 1986 layoff. According to Graves, freelancers like him were typically recruited into staff positions after a year of employment. Graves was fired after nine months at work, just when he expected that the quality of his work—"which was apparently satisfactory to my employer since my work was being utilized on national television programs"—would earn him a promotion to a staff position. (Graves Decl. at ¶ 14 (Ex. E to Pls.' Final Proposed Order for Relief).) Only freelancers, not staffers, were subject to the April 1986 layoff.

However, promotions at ABC were awarded only if "(1) a staff position had become vacant, either because a staff graphic artist had resigned or had been dismissed, or because ABC had authorized an expansion of the number of staff graphic artist positions in the Washington News Bureau's Graphics Department, and (2) the freelance graphic artist in question was the most qualified candidate for that staff position." (Dyball Decl. at ¶ 2 (Ex. 18 to Def.'s Reply to Pls.' Final Proposed Order).) Between Graves's firing and the general layoff, no staff graphic artist position became available or vacant. (Dyball Decl. at ¶ 3 (Ex. 18 to Def.'s Reply to Pls.' Final Proposed Order).) Even if a job had become open, according to defendant, Graves was a poor candidate for it: former coworkers have stated in affidavits that he talked incessantly, watched television at work constantly, was late for work and took over-long

meal breaks.[29] To be sure, Graves's own testimony disputes these characterizations of his work. Nevertheless, defendant has shown by a preponderance of the evidence that Graves would have been fired in the general 1986 layoff and that he was not likely to be one of the post-layoff re-hires. Accordingly, he is not entitled to backpay after that date.

### ii. Mitigation

ABC concedes that "based upon the Court's default judgment," Graves is entitled to backpay through April 1986 if this court finds that he took adequate steps to mitigate his damages during that period. (Def.'s Supp.Mem. in Opp'n to Pls.' Proposed Order for Relief at 10.) The court finds that he did. Graves made an earnest if unsuccessful effort to secure employment in his field in this five-month period of unemployment. Indeed, to collect the unemployment compensation that he received in 1986, he was required to demonstrate at least three hard contacts for prospective employment each week. (Graves Aff. at ¶ 28 (Ex. E to Pls.' Final Proposed Order for Relief).)

During the five-month period between the date he was fired and the date that he would have been laid off (had he not been fired), Graves earned no income.[30] He collected $11,280.00 in unemployment insurance in 1986. (Appendix A to Graves Aff. (Ex. E to Pls.' Final Proposed Order for Relief).) About a third of that payment—$3,760.00—is attributable to the fraction of the year that he would have been employed had ABC not fired him. During this same five-month period, Graves would have earned approximately $13,053.33 had he not be fired by ABC.[31]

---

**29.** Bottorff Decl. at ¶¶ 4–6; Hennessy Decl. at ¶ 9 (Exs. A, B to Def.'s Opp'n to Pls.' Proposed Order for Relief).

The court looks to this evidence, provided by defendant in the damages phase of this action, only because Graves made no allegations in his complaint that had he not been fired he would have been promoted to staff graphic artist. Had Graves made such allegations (and if the allegations were well-pleaded), then his version of the facts would have been taken as true by the default judgment, and this evidentiary inquiry would have been foreclosed.

**30.** Although defendant challenges the adequacy of Graves's income records since he was fired in 1986, the court finds that his records are satisfactory. He has stated under oath that he has submitted copies of "every W–2 form and every other tax form and every other document relating to income" that he has. Graves Decl. at ¶ 32 (Ex. E to Pls.' Final Proposed Order for Relief).

**31.** This is the sum of the income he states that he would have earned from November 19, 1985 to November 31, 1985 ($1,000.00), in December 1985 ($2,080.00), and one third of the $29,-920.00 salary for 1986. Appendix A to Graves

Accordingly, Graves is entitled to $9,293.33, which is $13,053.33 less his unemployment insurance payment for that period, $3,760.00.

### iii. Reinstatement

■ In addition to backpay, Graves seeks an order directing ABC to reinstate him as a full-time graphic artist. (Pls.' Final Proposed Order at 41.) As discussed above, however, Graves's old job at ABC no longer exists. He cannot be reinstated to it.

Construing his request liberally as seeking an order directing ABC to hire him as a staff graphic artist—a position that survived the April 1986 layoff—does not win Graves injunctive relief either. ABC has shown by a preponderance of the evidence that even if he had lasted the year at ABC, he was not likely to be promoted to staff graphic artist—not because of racism but because he was a poor candidate for promotion. This showing defeats Graves's claim for injunctive relief for the same reasons that it defeats his claim for post–1986 backpay.

### B. Retaliation

Shepherd claims $150,000.00 in damages for ABC's alleged retaliation against her for expressing concerns about workplace discrimination at a meeting of minority employees in October 1985. (Pls.' Proposed Order for Relief at 9.) Similarly, Graves claims $300,000.00 in damages for ABC's alleged retaliation against him for attending the October 1985 meeting and for encouraging Shepherd. (Pls.' Proposed Order for Relief at 8.) Both of these claims must be denied.

After plaintiffs made these retaliation damages claims in their May 1992 Proposed Order for Relief, this court vacated its original conclusion that ABC had retaliated against Graves and Shepherd for their attendance at the October meeting. (Mem.Op. of Sept. 3, 1993 at 39.) Because the default judgment against ABC on the retaliation count no longer stands, no damages can be awarded for it.

### C. Punitive Damages

■ Punitive damages awards are available for violations of the District of Columbia's Human Rights Act.[32] However, like punitive damages awards in general in this jurisdiction, they may be awarded only against one who " 'participated in the doing of such wrongful act or had previously authorized or subsequently ratified it with full knowledge of the facts.' " *Jordan v. Medley,* 711 F.2d 211, 216 (D.D.C.1983) (citation omitted). For punitive damages to be awarded against a corporate defendant, "it must be shown that the wrongful act was authorized and ratified by the corporation, not merely perpetrated by an employee." *Remeikis v. Boss & Phelps, Inc.,* 419 A.2d 986, 992 (D.C.App.1980). *See also Woodard v. City Stores Company,* 334 A.2d 189, 191 (D.C.App.1975) (mere retention and promotion of an employee does not amount to corporate ratification that would expose corporation to liability for punitive damages).

■ The default judgment in this case establishes that connection between ABC and its employee actors. Although the default judgment memorandum opinion says nothing explicit on the subject, the effect of the default judgment is to take as true all well-pleaded allegations (*see Hughes,* 449 F.2d at 63–64), and well-pleaded allegations in the complaint clearly establish the necessary link leading from ABC's employees' actions to ABC's liability.[33]

■ Punitive damages may be awarded only if "the conduct complained of [was]

---

Aff. (Ex. E to Pls.' Final Proposed Order for Relief).

**32.** *See, e.g., Green v. ABC,* 647 F.Supp. 1359, 1366 (D.D.C.1986); *McCormick v. District of Columbia,* 554 F.Supp. 640, 649 (D.C.Cir.1982).

**33.** The complaint alleges that Dyball, "the agent of the defendants ABC and Capital Cities/ABC" for the purposes of these discriminatory actions, took steps against Shepherd and Graves that were "ratified and aided and abetted by the defendant[ ] ABC" (Complaint at ¶ 12, 31); that

"senior officials of ABC have been made aware of the improper, unprofessional and unlawful conduct of the defendant Dyball as a supervisor and have failed to take corrective action and in fact have renewed the defendant Dyball's employment contract after notification of the nature of his conduct" against both Shepherd and Graves (Complaint at ¶¶ 23, 40); and that "ABC, Inc., ha[s] further authorized and ratified the above-described discrimination on the basis of race in that defendant Watson was specifically informed of the defendant Dyball's acts of dis-

'willful and outrageous, constitute[d] gross fraud, or [was] aggravated by evil motive, active malice, deliberate violence or oppression.'" *Raynor v. Richardson–Merrell, Inc.,* 643 F.Supp. 238, 245 (D.D.C.1986) (citations omitted). Plaintiffs' claims meet this standard. In finding that defendant intentionally inflicted emotional distress on plaintiffs, this court has already determined the two sufficient elements of a punitive damages claim: that defendant's actions were both intentional and outrageous. Accordingly, even though such awards are disfavored in the District of Columbia,[34] plaintiffs are entitled to punitive damages.

■ Setting the amount of punitive damages "is within the sound discretion of a trial court that is sitting without a jury." *Mariner Water v. Aqua Purification,* 665 F.2d 1066, 1071 (D.C.Cir.1981). Although plaintiffs claim $2,500,000 each in punitive damages from ABC, they cite no authorities granting such amounts. (Defendants, who have argued strongly that no punitive damages are due, have not offered this court any guidance on the range of punitive damages awards appropriate to discrimination cases.) This court's independent research indicates that there is an extraordinarily wide range of punitive damages awards, from $1,000 to $300,000.[35]

■ In the present case, defendant's behavior towards the plaintiffs was willful

---

crimination toward the plaintiff Graves ... and failed to take any corrective action to protect black employees under defendant Dyball's supervision, including the plaintiff Shepherd" (Complaint at ¶ 24).

None of these allegations is undermined by other allegations in the complaint, by evidence of which the court takes judicial note, or by uncontested facts in the record. All of them thus stand as conceded by the default. *See Hughes,* 449 F.2d at 63–64.

**34.** *See Mariner Water v. Aqua Purification,* 665 F.2d 1066, 1071 (D.C.Cir.1981).

**35.** In order of the awarded amount of punitive damages, a sampling of the range of cases is as follows:

*Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 205–07 (1st Cir.1987). The court set aside a jury verdict awarding plaintiff—a former employee alleging racial discrimination in his training, pay raises, and discharge—$3,000,000 in punitive damages, finding that an award of no more than $300,000 was "sufficient."

*Lowery,* 658 F.Supp. at 1267, *vacated by settlement,* 661 F.Supp. 65 (W.D.Tenn.1987). After a bench trial, the court awarded plaintiff—a black television news anchor who was denied promotion and otherwise discriminated against—$100,000 in punitive damages. The court found that defendant intended to punish plaintiff, shame him before the public, send a warning to his coworkers, and undermine civil rights legislation when it took plaintiff off the air for filing a Title VII action. The court noted that defendant's total current assets were over $140,000,000.

*Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 372–73 (D.C.App.1993). The court affirmed an award of $75,000 in punitive damages. Plaintiff, a former employee of one of the former "Big

Eight" accounting firms, filed a DCHRA action alleging employment discrimination and retaliation for pressing a discrimination claim. The court found that the large punitive damages award was justified because "[t]he actions of Arthur Young had a significant adverse effect on Sutherland's career, her professional reputation, and her financial well-being. There was strong evidence before the jury depicting a work environment in which decisions concerning promotions and compensation were improperly made on the basis of sex. Furthermore, the evidence did not merely show that Arthur Young was a rather unpleasant place for women to work because of the benighted attitude of some of the senior staff. Rather, it established that supervisory personnel both participated in and otherwise condoned working conditions in which women, including Sutherland, were subjected to sexist comments on a regular basis."

*Hunter,* 797 F.2d at 1425. The court upheld a $25,000 award in punitive damages against defendant who fired an employee in retaliation for complaining about racial harassment.

*Reeder–Baker v. Lincoln Nat'l Corp.,* 649 F.Supp. 647, 662–63 (N.D.Ind.1986), *aff'd,* 834 F.2d 1373 (7th Cir.1987). After a third trial, the court awarded plaintiff $25,000 in punitive damages. After plaintiff protested defendant's racial policies, defendant put her on permanent probation and later fired her, even though she did not violate her probation. The court noted that "[r]etaliation by itself would obviously not automatically justify punitive damages. This case involves more than retaliation. This case involves callous indifference to [plaintiff's] rights."

*Gierbolini Colon,* 666 F.Supp. at 341. After a bench trial, court awarded plaintiff $10,000 in punitive damages. The court gave its reasons for the award in strong language: "The extraordinary misconduct in this case is the defendants' assumption [that] they were entitled to their own

and egregious. Like the plaintiff in *Arthur Young*, who brought a very similar action under the DCHRA (*see supra* note 35), Graves and Shepherd were continually harassed in their jobs. Graves's superior forced him to work under more trying conditions that non-black employees, assigning him to menial tasks, keeping him in the dark about departmental procedures, setting him impossibly short deadlines and complaining that he did not meet them, and ultimately firing him. Likewise, Shepherd's superior consistently treated her worse than male and non-black employees, even those with less seniority, and humiliated her in front of her colleagues. Like the plaintiff in *Arthur Young*, the discrimination that Graves faced culminated in his losing his job;[36] like the *Arthur Young* plaintiff, he is entitled to $75,000 in punitive damages. Unlike the plaintiff in *Arthur Young*, however, the discrimination Shepherd faced was never so onerous as to drive her to quit. Accordingly, Shepherd is entitled only to $50,000 in punitive damages.

In closing, it is worth noting that each plaintiff's total award—$125,000 for Shepherd, and $184,293.33 for Graves—is safely below the amount that Congress believes is excessive compensation for employment discrimination. Congress has determined that discriminators like defendant ABC who are sued under Title VII can be held liable for no more than $300,000 for future pecuniary and non-pecuniary compensatory damages and punitive damages.[37] Although this is a DCHRA and not a Title VII case, Congress's upper limit on compensatory and punitive damages does give this court a sense of the national consensus on what a reasonable award is. The awards in this case do not exceed that nationally sanctioned figure.

### D. Injunctive Relief

Lastly, plaintiffs' complaint and proposed order for relief ask this court to enter orders directing defendant ABC to desist from the discriminatory conduct against Shepherd and Graves that was described in the complaint. (Complaint at 18, 19; Pls.' Proposed Order for Relief at 4–5.) This court shall enter an order directing defendant ABC to desist from the discriminatory conduct described against Shepherd, since she still works for defendant ABC. Because Graves is no longer working for defendant ABC, no order protecting him from employment discrimination need issue, and his request for injunctive relief shall be denied as moot.

### E. Attorney's Fees and Costs

Finally, plaintiffs have requested attorney's fees and costs incurred in this action.

█ As the prevailing party, plaintiffs are clearly entitled to reasonable attorney's fees and costs under the DCHRA.[38] However, the fact that their counsel took this case on contingency does not entitle them to their claimed 200 percent enhancement of the lodestar amount. Such contingency enhancements are not permitted in the District of

---

36. In *Arthur Young*, the D.C. Court of Appeals affirmed a jury finding that plaintiff was constructively discharged when her working conditions became intolerable. *Arthur Young*, 631 A.2d at 360–65.

37. 42 U.S.C. § 1981a(b)(3)(D). The court here assumes that ABC has employed more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year.

politically slanted portion of the public airwaves. To accomplish this inherently antidemocratic act, they used their purported power to banish an innocent man from a job he adequately performed. [Plaintiff] was nothing more than a political pawn in their attempt to control the radio station. This is indeed extraordinary misconduct and evinces an evil motive." (As noted above in note 18, although plaintiff was demoted from his position as director of a public radio station, this was not a racial or sexual discrimination case. Plaintiff sued under § 1983 for violation of his constitutional rights to due process and to freedom of association and belief.) *Stallworth*, 777 F.2d at 1435. A $1,000 punitive damages award was affirmed on appeal along with a $100,000 non-pecuniary compensatory damages award. One of the defendants conducted a "sham selection procedure" and changed the job requirements to deliberately discriminate against plaintiff.

38. The DCHRA permits this court to award plaintiffs "such relief as it deems appropriate, including by not limited to, such relief as is provided in § 1–2553(a)." 2 D.C.Code § 1–2556(b) (Supp.1994). Section 1–2553(a)(1)(E) provides for the "payment of reasonable attorneys fees." Prevailing parties are entitled to reasonable attorney's fees. *See, e.g., Thompson v. Intern. Ass'n of Mach. & Aero. Workers*, 664 F.Supp. 578, 580 (D.D.C.1987).

Columbia under federal fee-shifting statutes,[39] and rules governing the determination of federal fee awards routinely govern DCHRA fee awards.[40]

Aside from these broad brushstrokes, the precise amount of attorney's fees and costs owed to plaintiffs is still undetermined. To aid this court's determination of an appropriate award, the parties shall submit supplemental briefing on the issue in accordance with an order that will issue separately. Upon review of the supplemental briefs, this court shall issue a separate order awarding reasonable attorney's fees and costs. In the meantime, the quantification of a reasonable attorney's fee award and costs shall be delayed until further briefing.

## IV. CONCLUSION

Accordingly, for the reasons stated above, Shepherd shall be awarded $125,000.00 in damages from defendant ABC, Graves shall be awarded $184,293.33 in damages from defendant ABC, and defendant ABC shall desist from the discriminatory conduct against plaintiff Shepherd that was described in the complaint. A separate order shall issue this date.

## ORDER

This case comes before this court on plaintiffs' request for attorney's fees and costs from defendant American Broadcasting Companies, Inc., under the District of Columbia's Human Rights Act, 2 D.C.C. §§ 1–2501 et seq. To aid this court's determination of an appropriate award, it is hereby ORDERED that the parties shall submit supplemental briefing on the issue in accordance with the following schedule:

1. Within 20 days of the date of this order, plaintiffs shall submit a final request for attorney's fees and costs. Such request will contain the following:

a. A single, updated, detailed and accurate statement of all attorney's fees requested in this case.

b. A single, updated, detailed and accurate statement of all costs (expended either by plaintiffs' counsel or by plaintiffs themselves) that plaintiffs seek to have taxed to defendant ABC. The statement must designate the statutory or other authority that permits this court to tax each cost.

c. A statement of plaintiffs' counsels' claimed hourly rate or rates, and a brief and clear statement of whether their claimed rate is their established billing rate, or the prevailing market rate.

i. If counsels' claimed rate is their established billing rate, plaintiffs shall state what their counsels' established billing rate is and what it has been for each year of this litigation. Plaintiffs shall also provide evidence showing whether those rates are within the range of rates charged for such services in the District of Columbia.

ii. If counsels' claimed rate is the prevailing market rate, plaintiffs shall demonstrate that their counsel lack an established billing history upon which an award may be based. They shall also provide evidence showing that plaintiffs' counsel have lowered their rates below the prevailing market rate out of public interest motives.

d. A statement of the number of hours their counsel worked on this case. Plaintiffs shall demonstrate good billing judgment in indicating wasted or needlessly spent time that should not be charged to defendant.

e. A statement of whether plaintiffs seek current or historical rates for their counsels' work, and a brief argument in favor of plaintiffs' choice.

2. Defendant ABC may submit an opposition within ten days of the filing of plaintiff's final fee request. Such opposition shall contain the following:

a. A single, updated, detailed and accurate statement of all the attorney's fees and costs requested by plaintiffs that defendant does not contest, in light of this court's ruling

---

**39.** See King v. Palmer, 950 F.2d 771, 784 (D.C.Cir.1991) (en banc), cert. denied, —— U.S. ——, 112 S.Ct. 3054, 120 L.Ed.2d 920 (1992).

**40.** See, e.g., Goos v. Nat'l Ass'n of Realtors, 997 F.2d 1565, 1568 (D.C.Cir.1993) (applying rules governing federal fee awards to a DCHRA fee award).

that plaintiffs are entitled to reasonable attorney's fees and costs.

b. A single, updated, detailed and accurate statement of all the attorney's fees and costs requested by plaintiffs that defendant contests. Defendant shall state in detail why it contests each of the contested items.

c. Any other arguments, rebuttals, or discovery requests that defendant wishes to make.

3. Plaintiff may submit a final reply regarding the amount of attorney's fees and costs to be awarded within seven days of service of the opposition.

SO ORDERED.

## ORDER

This case comes before this court on five motions relating to the determination of a damages award. Upon consideration of these motions, their oppositions, and replies, it is hereby ORDERED that

1. Defendants' motion for certification of the court's default judgment is DENIED.

2. Defendants' motion for leave to file an opposition to plaintiffs' final proposed order for relief and supplemental supporting memorandum is GRANTED. The Clerk of the Court shall file defendants' opposition to plaintiffs' final proposed order for relief and supplemental supporting memorandum as of the date of this order.

3. Plaintiffs' motion to seal their opposition to defendants' motion for leave to file a reply to plaintiffs' final proposed order for relief is DENIED as moot. The motion seeks to prevent defense counsel from revealing to defendant Dyball certain facts about a witness's allegations. Dyball, however, already knew those facts before plaintiffs filed the motion to seal. The memorandum of Kenneth Dyball in opposition to the motion to seal, and any and all other filings pertaining to the motion to seal shall be unsealed forthwith.

4. Defendant Dyball's motion for leave to file a surreply to plaintiffs' reply to defendant Dyball's opposition to plaintiffs' motion to seal plaintiffs' opposition to defendants' motion for leave to file a reply to plaintiffs'

final proposed order for relief is GRANTED. The Clerk of the Court shall file defendant Dyball's surreply as of the date of this order.

5. Plaintiffs' motion for leave to file a reply to all defendants' oppositions to plaintiffs' proposed order for relief is DENIED as moot. The motion seeks leave to submit a reply by July 16, 1992, a date that has long passed. (No proposed reply was submitted as an exhibit to plaintiffs' motion.) In any event, on December 20, 1993, plaintiffs filed a final proposed order for relief and a supplemental supporting memorandum, which addresses many of the issues raised by defendants' oppositions to plaintiffs' original proposed order and serves in effect as a reply.

SO ORDERED.

## ORDER AND FINAL JUDGMENT

Upon consideration of plaintiffs' original and final proposed orders, defendant's oppositions, other responsive papers, and the entire record herein, and for the reasons stated in an accompanying memorandum opinion issued this date, it is hereby ORDERED that FINAL JUDGMENT be entered as follows:

1. Defendant American Broadcasting Companies, Inc. ("ABC") shall pay plaintiff Michele Shepherd $125,000.00 in damages. This amount reflects the following awards:

| | |
|---|---|
| Intentional Infliction of Emotional Distress | $ 75,000.00 |
| Punitive Damages | $ 50,000.00 |

2. Defendant ABC shall pay plaintiff La-Rue Graves $184,293.33 in damages. This amount reflects the following awards:

| | |
|---|---|
| Intentional Infliction of Emotional Distress | $100,000.00 |
| Backpay | $ 9,293.33 |
| Punitive Damages | $ 75,000.00 |

Graves's request for an order directing defendant ABC to reinstate him in any position at ABC is DENIED.

3. Defendants Capital Cities/ABC, Inc., Kenneth Dyball and George Watson are not liable for any damages or injunctive relief under this order, and they are hereby DISMISSED from this case.

4(a). Shepherd's request for injunctive relief is GRANTED. Defendant ABC shall desist from the discriminatory conduct against Shepherd that was described in the complaint.

4(b). Graves's request for injunctive relief directing defendant ABC to desist from the discriminatory conduct described in the complaint is DENIED as moot because Graves is no longer employed by defendant ABC.

5. Plaintiffs are awarded reasonable attorney's fees and costs. The quantification of this award shall be separately determined after further briefing, as directed by this court in a separate order issued this date.

SO ORDERED.